# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF OREGON et al.,

*Plaintiffs-Appellees*,

*v.*

ALEX M. AZAR II, in his official capacity as
the Secretary of Health and Human Services, et al.,

*Defendants-Appellants.*

AMERICAN MEDICAL ASSOCIATION et al.,

*Plaintiffs-Appellees*,

*v.*

ALEX M. AZAR II, in his official capacity as
the Secretary of Health and Human Services, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Oregon, Nos. 19-cv-317, 19-cv-318 (McShane, J.)

**PETITION OF PLAINTIFFS-APPELLEES
AMERICAN MEDICAL ASSOCIATION, OREGON MEDICAL
ASSOCIATION, PLANNED PARENTHOOD FEDERATION OF
AMERICA, INC., PLANNED PARENTHOOD OF SOUTHWESTERN
OREGON, PLANNED PARENTHOOD COLUMBIA WILLAMETTE,
THOMAS N. EWING, M.D., AND MICHELE P. MEGREGIAN, C.N.M.
FOR FULL COURT OR LIMITED EN BANC COURT REHEARING OF
THE LIMITED EN BANC COURT'S FEBRUARY 24, 2020 OPINION**

PAUL R.Q. WOLFSON
KIMBERLY A. PARKER
ALBINAS J. PRIZGINTAS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006

ALAN E. SCHOENFELD
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com

*Counsel for Planned Parenthood Federation of America, Inc., Planned
Parenthood of Southwestern Oregon, Planned Parenthood Columbia Willamette,
Thomas N. Ewing, M.D., and Michele P. Megregian, C.N.M.*

April 8, 2020

**ADDITIONAL COUNSEL ON INSIDE COVER**

JEREMY D. SACKS
PER A. RAMFJORD
KENNON SCOTT
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel.: (503) 224-3380
Fax: (503) 220-2480
jeremy.sacks@stoel.com
per.ramfjord@stoel.com
kennon.scott@stoel.com

*Counsel for All Plaintiffs*

HELENE T. KRASNOFF
CARRIE Y. FLAXMAN
PLANNED PARENTHOOD
    FEDERATION OF AMERICA, INC.
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
Tel.: (202) 973-4800
Fax: (202) 296-3480
helene.krasnoff@ppfa.org
carrie.flaxman@ppfa.org

*Counsel for Planned Parenthood
Federation of America, Inc., Planned
Parenthood of Southwestern Oregon,
Planned Parenthood Columbia
Willamette, Thomas N. Ewing, M.D., and
Michele P. Megregian, C.N.M.*

BRIAN D. VANDENBERG
LEONARD A. NELSON
ERIN G. SUTTON
AMERICAN MEDICAL ASSOCIATION
Office of General Counsel
300 N. Wabash Avenue
Chicago, IL 60611
Tel.: (312) 464-5532
Fax: (312) 224-6924
brian.vandenberg@ama-assn.org
leonard.nelson@ama-assn.org
erin.sutton@ama-assn.org

*Counsel for American Medical
Association and Oregon Medical
Association*

MARK BONANNO
OREGON MEDICAL ASSOCIATION
General Counsel
11740 SW 68th Parkway, Suite 100
Portland, OR 97223
Tel.: (503) 619-8117
Fax: (503) 619-0609
mark@theoma.org

*Counsel for American Medical
Association and Oregon Medical
Association*

## RULE 35 STATEMENT

This case involves a challenge to an HHS regulation that has warped and decimated the Title X program—a vital public health program that has, until the Final Rule, provided millions of Americans critical and often life-saving care each year. It concerns questions of exceptional importance. Indeed, this Court already reached that conclusion in granting en banc rehearing last July. *See California ex rel. Becerra v. Azar*, 927 F.3d 1045, 1046 (9th Cir. 2019). And the Fourth Circuit reached the same conclusion two weeks ago in granting initial hearing en banc of a challenge to the same HHS regulation. *See Mayor & City Council of Baltimore v. Azar*, __ F. App'x __, 2020 WL 1514779 (4th Cir. Mar. 27, 2020); *see also id.* at *1 (Thacker, J., concurring in grant of initial hearing en banc and denial of HHS's motion to stay) ("I am convinced this case presents an extraordinary circumstance.").

The limited en banc Court's sharply divided opinion warrants further review in this Court—either by the full Court or by the limited en banc Court—because it represents an unprecedented short-circuiting of normal judicial processes. For the reasons set forth in the rehearing petition filed this same day in Case No. 19-35394, that opinion conflicts with holdings of the Supreme Court, this Court's precedent, and fundamental principles of fairness to litigants. *See, e.g.*, *University of Tex. v. Camenisch*, 451 U.S. 390, 395-398 (1981); *Southwest Voter Registration*

*Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc); *Beno v. Shalala*, 30 F.3d 1057, 1063-1064 & n.11 (9th Cir. 1994).

The questions presented are:

1.  Whether the limited en banc Court improperly decided the final merits of claims of arbitrary rulemaking on a preliminary injunction appeal without the administrative record, without warning to the parties, and without Plaintiffs having a full and fair opportunity to develop and present those claims.

2.  Whether the limited en banc Court erred in upholding this rulemaking based on unquestioning deference to the agency's unreasoned assertions that contradict the administrative record.

## ARGUMENT

To avoid repetitive briefing, Plaintiffs join in full in the arguments made in the rehearing petition filed this same day by the State of Washington, National Family Planning & Reproductive Health Association, et al. in Case No. 19-35394 (Dkt. 139). That case was heard and decided together with this one.

As explained in that rehearing petition, the limited en banc Court's opinion warrants either full Court or limited en banc Court rehearing for two principal reasons. *First*, the Court should correct use of an interlocutory appeal to decide final merits without the necessary record and fair chance to litigate. *Second*, the

Court should restore essential Administrative Procedure Act requirements that an agency not act contrary to the evidence and without reasoned basis.

## CONCLUSION

The full Court or limited en banc Court should grant rehearing of the limited en banc Court's February 24, 2020 opinion.

April 8, 2020

Respectfully submitted.

/s/ Alan E. Schoenfeld

JEREMY D. SACKS
PER A. RAMFJORD
KENNON SCOTT
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel.: (503) 224-3380
Fax: (503) 220-2480
jeremy.sacks@stoel.com
per.ramfjord@stoel.com
kennon.scott@stoel.com

*Counsel for All Plaintiffs*

BRIAN D. VANDENBERG
LEONARD A. NELSON
ERIN G. SUTTON
AMERICAN MEDICAL ASSOCIATION
Office of General Counsel
300 N. Wabash Avenue
Chicago, IL 60611
brian.vandenberg@ama-assn.org
leonard.nelson@ama-assn.org
erin.sutton@ama-assn.org

*Counsel for American Medical Association and Oregon Medical Association*

Mark Bonanno
OREGON MEDICAL ASSOCIATION
General Counsel
11740 SW 68th Parkway, Suite 100
Portland, OR 97223
mark@theoma.org

*Counsel for American Medical Association and Oregon Medical Association*

ALAN E. SCHOENFELD
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com

*Counsel for Planned Parenthood Federation of America, Inc., Planned Parenthood of Southwestern Oregon, Planned Parenthood Columbia Willamette, Thomas N. Ewing, M.D., and Michele P. Megregian, C.N.M.*

PAUL R.Q. WOLFSON
KIMBERLY A. PARKER
ALBINAS J. PRIZGINTAS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
paul.wolfson@wilmerhale.com
kimberly.parker@wilmerhale.com
albinas.prizgintas@wilmerhale.com
joshua.koppel@wilmerhale.com

*Counsel for Planned Parenthood Federation of America, Inc., Planned Parenthood of Southwestern Oregon, Planned Parenthood Columbia Willamette, Thomas N. Ewing, M.D., and Michele P. Megregian, C.N.M.*

Helene T. Krasnoff
Carrie Y. Flaxman
PLANNED PARENTHOOD
   FEDERATION OF AMERICA, INC.
1110 Vermont Avenue NW,
Suite 300
Washington, DC 20005
Tel.: (202) 973-4800
Fax: (202) 296-3480
helene.krasnoff@ppfa.org
carrie.flaxman@ppfa.org

*Counsel for Planned Parenthood Federation of America, Inc., Planned Parenthood of Southwestern Oregon, Planned Parenthood Columbia Willamette, Thomas N. Ewing, M.D., and Michele P. Megregian, C.N.M.*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing or Answers

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)**  | 19-35386

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/answer to petition is (*select one*):

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 487 |.

*(Petitions and answers must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Alan E. Schoenfeld | **Date** | Apr 8, 2020

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 11**  *Rev. 12/01/2018*

# CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of April, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Alan E. Schoenfeld*
ALAN E. SCHOENFELD

# ADDENDUM

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra, <br> *Plaintiff-Appellee,* <br><br> v. <br><br> ALEX M. AZAR II, in his Official Capacity as Secretary of the U.S. Department of Health & Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, <br> *Defendants-Appellants.* | No. 19-15974 <br><br> D.C. No. <br> 3:19-cv-01184-EMC |
| ESSENTIAL ACCESS HEALTH, INC.; MELISSA MARSHALL, M.D., <br> *Plaintiffs-Appellees,* <br><br> v. <br><br> ALEX M. AZAR II, Secretary of U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, <br> *Defendants-Appellants.* | No. 19-15979 <br><br> D.C. No. <br> 3:19-cv-01195-EMC |

2   STATE OF CALIFORNIA V. AZAR

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

| | |
|---|---|
| STATE OF OREGON; STATE OF NEW YORK; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; AMERICAN MEDICAL ASSOCIATION; OREGON MEDICAL ASSOCIATION; PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD OF SOUTHWESTERN OREGON; PLANNED PARENTHOOD COLUMBIA WILLAMETTE; THOMAS N. EWING, M.D.; MICHELE P. MEGREGIAN, | No. 19-35386<br><br>D.C. Nos.<br>6:19-cv-00317-MC<br>6:19-cv-00318-MC |

C.N.M.,
                    *Plaintiffs-Appellees,*

                    v.

ALEX M. AZAR II; U.S.
DEPARTMENT OF HEALTH &
HUMAN SERVICES; DIANE
FOLEY; OFFICE OF POPULATION
AFFAIRS,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

4          STATE OF CALIFORNIA V. AZAR

| | |
|---|---|
| STATE OF WASHINGTON; NATIONAL FAMILY PLANNING AND REPRODUCTIVE HEALTH ASSOCIATION; FEMINIST WOMEN'S HEALTH CENTER; DEBORAH OYER, M.D.; TERESA GALL, | No. 19-35394<br><br>D.C. Nos.<br>1:19-cv-03040-SAB<br>1:19-cv-03045-SAB |
| *Plaintiffs-Appellees,* | OPINION |
| v. | |
| ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; DIANE FOLEY, M.D., in her official capacity as Deputy Assistant Secretary for Population Affairs; OFFICE OF POPULATION AFFAIRS, *Defendants-Appellants.* | |

Appeal from the United States District Court
for the Eastern District of Washington
Stanley Allen Bastian, District Judge, Presiding

Argued and Submitted En Banc September 23, 2019
San Francisco, California

Filed February 24, 2020

Before:  Sidney R. Thomas, Chief Judge, and Edward
Leavy, Kim McLane Wardlaw, William A. Fletcher,
Richard A. Paez, Jay S. Bybee, Consuelo M. Callahan,
Milan D. Smith, Jr., Sandra S. Ikuta, Eric D. Miller
and Kenneth K. Lee, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Paez

## SUMMARY[*]

### Title X of the Public Health Service Act

The en banc court vacated preliminary injunctions entered by three district courts in three states against the U.S. Department of Health and Human Services's ("HHS") enforcement of a 2019 rule, promulgated by HHS under Title X of the Public Health Service Act, concerning grants to support voluntary family projects, and prohibition of funds being used in programs where abortion is a method of family planning.

Section 1008 of Title X prohibits grant funds from "be[ing] used in programs where abortion is a method of family planning." Regulations issued in 1988, and upheld by the Supreme Court in 1991, completely prohibited the use of Title X funds in projects where clients received counseling or referrals for abortion as a method of family planning. *Rust v. Sullivan*, 500 U.S. 173, 177-79 (1991). Regulations issued in 2000 were more permissive. In March 2019, HHS promulgated the 2019 rule, which was similar to the regulations adopted in 1988 and upheld by *Rust*. Plaintiffs, including several states and private Title X grantees, brought various suits challenging the 2019 Final Rule.

The en banc court first considered plaintiffs' argument that the 2019 Final Rule was facially invalid because two intervening congressional enactments altered the legal landscape so that *Rust*'s holdings were no longer valid. The

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

court held that plaintiffs failed to provide evidence that Congress intended to alter *Rust*'s conclusion that the 1988 Rule was a permissible interpretation of Title X and § 1008.

The en banc court held that the 2019 Final Rule was not contrary to the 1996 appropriations rider, which was enacted to ensure no federal funds were used to support abortion services. Specifically, the panel held that because HHS can reasonably interpret "nondirective pregnancy counseling" as not including referrals, plaintiffs failed at the first step of their arguments, that "pregnancy counseling" must be deemed to include referrals. Plaintiffs also failed at the second step of their argument that the term "nondirective" meant the presentation of all options on an equal basis. The court held that HHS reasonably interpreted "nondirective" to refer to the neutral manner in which counseling was provided rather than to the scope of topics that must be covered in counseling. The court rejected plaintiffs' and the dissent's argument that the Final Rule was directive because it required referrals for medically necessary prenatal health care. The court also held that requiring referrals for medically necessary prenatal health care but not for nontherapeutic abortions did not make pregnancy counseling directive. Nor was the Final Rule directive because it allowed referrals for adoption. Finally, the court held that the Final Rule's restrictions on referral lists did not render pregnancy counseling directive because a referral list did not present information in a way that encouraged or promoted a specific option.

The en banc court held that the 2019 Final Rule was consistent with § 1554 of the Affordable Care Act ("ACA"). The court held that the ACA did not address the implementation of Congress's choice not to subsidize certain activities. The Final Rule placed no substantive barrier on

individuals' ability to obtain appropriate medical care or on doctors' ability to communicate with clients or engage in activity when not acting within a Title X project, and therefore the Final Rule did not implicate § 1554.

The en banc court concluded that the Final Rule was not contrary to the appropriations rider, § 1554 of the ACA, or Title X. The court held that plaintiffs' claims based on these provisions would not succeed, and plaintiffs, accordingly, did not demonstrate a likelihood of success on the merits based on these grounds.

The en banc court next turned to plaintiffs' arguments that the 2019 Final Rule was arbitrary and capricious under the Administrative Procedure Act. First, plaintiffs argued that HHS's promulgation of the physical and financial separation requirement in 42 C.F.R. § 59.15 was arbitrary and capricious. The court held that HHS examined the relevant considerations and provided a reasoned analysis for adopting this provision. In light of HHS's reasoned explanation of its decisions and its consideration of the comments raised, the court rejected plaintiffs' arguments that HHS failed to base its decision on evidence, failed to consider potential harms in its cost-benefit analysis, failed to explain its reasons for departing from the 2000 Rule's provisions, and failed to consider the reliance interest of providers who have incurred costs relying on HHS's previous regulation. Second, plaintiffs argued that HHS's cost-benefit analysis of the 2019 Final Rule was arbitrary and capricious. The court held that HHS reasonably concluded that the harms flowing from a gap in care would not develop, and on this record, the court would not second-guess HHS's consideration of the risks and benefits of its action. Third, plaintiffs asserted that the referral restrictions were arbitrary and capricious. Because

HHS's decisionmaking path could reasonably be determined, the court rejected plaintiffs' claims that the counseling and referral restrictions were arbitrary and capricious. Fourth, the court rejected plaintiffs' arguments that HHS's technical determination of which medical professionals could provide pregnancy counseling was arbitrary and capricious. Finally, the court rejected plaintiffs' argument that HHS was arbitrary and capricious in reestablishing the language of the 1988 Rule's requirement that all family planning methods and services be "acceptable and effective," instead of retaining the 2000 Rule's revision requiring that such methods and services also be "medically approved." The court held that HHS adequately explained its reasons for reestablishing the 1988 Rule, and sufficiently addressed comments that its decision to omit the phrase "medically approved" would promote political ideology over science, lead to negative health consequences for clients, and undermined recommendations from other agencies.

The en banc court held that plaintiffs would not prevail on the merits of their legal claims, and they were not entitled to the extraordinary remedy of a preliminary injunction. Accordingly, the court vacated the district courts' preliminary injunction orders, and remanded for further proceedings. The government's motion for a stay pending appeal was denied as moot.

Judge Paez, joined by Chief Judge Thomas, and Judges Wardlaw and W. Fletcher, dissented. Judge Paez would hold that the 2019 Final Rule breached Congress' limitations on the scope of HHS's authority, and he would uphold the district courts' preliminary injunctions enjoining enforcement of the Rule. Among other things, the Final Rule gags health care providers from fully counseling women about their

options while pregnant and requires them to steer women toward childbirth, and requires providers to physically and financially separate any abortion services they provide from all other health care services they deliver. Judge Paez concluded that the majority sanctions the agency's gross overreach and puts its own policy preferences before the law.

---

## COUNSEL

Hashim M. Mooppan (argued), Deputy Assistant Attorney General; Britton Lucas (argued), Senior Counsel; Michael S. Raab, Katherine Allen, and Jaynie Lilley, Appellate Staff; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants Alex M. Azar II, U.S. Department of Health & Human Services, Diane Foley, and Office of Population Affairs.

Benjamin N. Gutman (argued), Solicitor General; Jona J. Maukonen, Senior Assistant Attorney General; Ellen F. Rosenblum, Attorney General; Office of the Attorney General, Salem, Oregon; Letitia James, Attorney General; Barbara D. Underwood, Solicitor General; Anisha S. Dasgupta, Deputy Solicitor General; Judith N. Vale, Senior Assistant Solicitor General; Office of the Attorney General, New York, New York; for Plaintiffs-Appellees Oregon, New York, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Pennsylvania, Rhode Island, Vermont, Virginia, and Wisconsin.

Ruth E. Harlow (argued), Fiona Kaye, Anjali Dalal, Elizabeth Deutsch, and Brigitte Amiri, American Civil Liberties Union Foundation, New York, New York; Emily Chiang, American Civil Liberties Union Foundation of Washington, Seattle, Washington; Joe Shaeffer, MacDonald Hoague & Bayless, Seattle, Washington; for Plaintiffs-Appellees National Family Planning and Reproductive Health Association; Feminist Women's Health Center; Deborah Oyer, M.D.; and Teresa Gall.

Xavier Becerra, Attorney General; Edward C. DuMont, Solicitor General; Kathleen Boergers, Supervising Deputy Attorney General; Joshua Patashnik, Deputy Solicitor General; Anna Rich, Brenda Ayon Verduzco, and Ketakee Kane, Deputy Attorneys General; California Department of Justice, San Francisco, California; for Plaintiff-Appellee State of California.

Michelle S .Ybarra, Justina Sessions, Sophie Hood, and Sarah Salomon, Keker Van Nest & Peters LLP, San Francisco, California, for Plaintiffs-Appellees Essential Access Health, Inc., and Melissa Marshall, M.D.

Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Paul R.Q. Wolfson, Kimberly A. Parker, Albinas J. Prizgintas, and Joshua M. Koppel, Wilmer Cutler Pickering Hale and Dorr LLPP, Washington, D.C.; Jeremy D. Sacks, Per A. Ramfjord, and Kennon Scott, Stoel Rives LLP, Portland, Oregon; Brian D. Vandenberg, Leonard A. Nelson, and Erin G. Sutton, American Medical Association; Helene T. Krasnoff, and Carrie Y. Flaxman, Planned Parenthood of America Inc., Washington, D.C.; Mark Bonanno, General Counsel, Oregon Medical Association, Portland, Oregon; for Plaintiffs-Appellees

American Medical Association; Oregon Medical Association; Planned Parenthood Federation of America, Inc.; Planned Parenthood of Southwestern Oregon; Planned Parenthood Columbia Willamette; Thomas N. Ewing, M.D.; and Michele P. Megregian, C.N.M.

Robert W. Ferguson, Attorney General; Noah G. Purcell, Solicitor General; Jeffrey T. Sprung, Kristin Beneski, and Paul M. Crisalli, Assistant Attorneys General; Office of the Attorney General, Seattle, Washington; for Plaintiff-Appellee State of Washington.

Dave Yost, Attorney General; Benjamin M. Flowers, State Solicitor; Stephen P. Carney and Jason D. Manion, Deputy Solicitors; Office of the Attorney General, Columbus, Ohio; Steve Marshall, Alabama Attorney General; Leslie Rutledge, Arkansas Attorney General; Curtis T. Hill, Jr., Indiana Attorney General; Jeff Landry, Louisiana Attorney General; Eric S. Schmitt, Missouri Attorney General; Doug Peterson, Nebraska Attorney General; Mike Hunter, Oklahoma Attorney General; Alan Wilson, South Carolina Attorney General; Jason Ravnsborg, South Dakota Attorney General; Herbert H. Slatery III, Tennessee Attorney General; Ken Paxton, Texas Attorney General; and Sean Reyes, Utah Attorney General; for Amici Curiae Ohio and 12 Other States.

Catherine Glenn Foster, Steven H. Aden, and Rachel N. Morrison, Washington, D.C., as and for Amicus Curiae Americans United for Life.

Jay Alan Sekulow and Stuart J. Roth, Washington, D.C., as and for Amicus Curiae American Center for Law & Justice.

Sarah E. Pitlyk and Adam S. Hochschild, Thomas More Society, Chicago, Illinois, for Amicus Curiae Susan B. Anthony List.

James E. Hough, Morrison & Foerster LLP, New York, New York; Andre Fontana, Morrison & Foerster LLP, San Francisco, California; Shannon Minter, Julianna Gonen, Amy Whelan, and Julie Wilensky, National Center for Lesbian Rights, San Francisco, California; for Amici Curiae National Center for Lesbian Rights, Equality Federation, Family Equality Council, GLMA: Health Professionals Advancing LGBTQ Equality, The HIV Medicine Association, The National Center for Transgender Equality, The National LGBTQ Task Force, The Sexuality Information and Education Council of the United States (SIECUS), The LGBT Movement Advancement Project, Lambda Legal Defense and Education Fund, Inc., GLBTQ Legal Advocates & Defenders, The Human Rights Campaign, Transgender Law Center, and Bay Area Lawyers for Individual Freedom.

Martha Jane Perkins, National Health Law Program, Carrboro, North Carolina, for Amici Curiae The National Health Law Program, Advocates for Youth, American Medical Student Association, American Society for Reproductive Medicine, Community Catalyst, The Endocrine Society, Families USA, HIV Medicine Association, In Our Own Voice: National Black Women's Reproductive Justice Agenda, Juvenile Law Center, The Leadership Conference on Civil and Human Rights, National Council of Jewish Women, NARAL Pro-Choice America, National Abortion Federation, National Immigration Law Center, National Institute for Reproductive Health, National Latina Institute for Reproductive Health, National Partnership for Women & Families, National Women's Health Network, National

Women's Law Center, Northwest Health Law Advocates, Positive Women's Network—USA, Power to Decide, Union for Reform Judaism, Central Conference of American Rabbis, Women of Reform Judaism, Men of Reform Judaism, Unite for Reproductive & Gender Equity, Whitman-Walker Health, WomenHeart, and YWCA USA.

Richard L. Revesz, Madison Condon, Bethany A. Davis Noll, and Jason Schwartz, New York, New York, as and for Amicus Curiae Institute for Policy Integrity at New York University School of Law.

Zachary W. Carter, Corporation Counsel; Richard Dearing, Claude S. Platton, Jamison Davies, Melanie C.T. Ash, and Kevin Osowski, Of Counsel; Law Department, New York, New York; Andre M. Davis, City Solicitor, Baltimore, Maryland; Zach Klein, City Attorney, Columbus, Ohio; Dennis J. Herrera, City Attorney, City Attorney's Office, San Francisco, California; James R. Williams, County Counsel, County of Santa Clara, San Jose, California; Anthony P. Condotti, City Attorney, Santa Cruz, California; Mark A. Flessner, Corporation Counsel; Benna Ruth Solomon, Deputy Corporation Counsel; Department of Law, Chicago, Illinois; Michael N. Feuer, City Attorney, Los Angeles, California; Mary C. Wickham, County Counsel, Los Angeles, California; Philippa M. Guthrie, Corporation Counsel, Legal Department, Bloomington, Indiana; Barbara J. Parker, City Attorney, Oakland, California; Ronald C. Lewis, City Attorney; Judith L. Ramsey, Chief, General Litigation Section; Collyn Peddie, Senior Assistant City Attorney, Houston, Texas; Peter S. Holmes, City Attorney, Seattle, Washington; for Amici Curiae City of New York, New York City Health and Hospitals, and 12 Local Governments.

Bina G. Patel and David D. Doak, Quinn Emanuel Urguhart & Sullivan LLP, San Francisco, California; Valerie Roddy, Quinn Emanuel Urguhart & Sullivan LLP, Los Angeles, California; for Amicus Curiae National Center for Youth Law.

Lisa H. Bebchick, Ropes & Gray LLP, New York, New York; Thomas N. Bulleit and Douglas Hallward-Griemeier, Ropes & Gray LLP, Washington, D.C.; Daniel W. Richards, Ropes & Gray LLP, East Palo Alto, California; Haley Eagon, Ropes & Gray LLP, Boston, Massachusetts; Nadia Dahab, Stoll Berne, Portland, Oregon; Taylor Washburn, Lane Powell PC, Seattle, Washington; for Amici Curiae American College of Obstetricians and Gynecologists, American Academy of Pediatrics, American Academy of Family Physicians, American College of Physicians, California Medical Association, Society for Adolescent Health and Medicine, and Society for Maternal-Fetal Medicine.

Theane Evangelis, Lauren M. Blas, and Virginia L. Smith, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Amicus Curiae California Women's Law Center.

16 STATE OF CALIFORNIA V. AZAR

## OPINION

IKUTA, Circuit Judge:

Title X of the Public Health Service Act gives the Department of Health and Human Services (HHS) authority to make grants to support "voluntary family planning projects" for the purpose of offering "a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).[1] Section 1008 of Title X prohibits grant funds from "be[ing] used in programs where abortion is a method of family planning." *Id.* § 300a-6.

Since 1970, when Title X was first enacted, HHS has provided competing interpretations of this prohibition. Regulations issued in 1988, and upheld by the Supreme Court in 1991, completely prohibited the use of Title X funds in projects where clients received counseling or referrals for abortion as a method of family planning. *Rust v. Sullivan*, 500 U.S. 173, 177–79 (1991). Regulations issued in 2000 were more permissive.

In March 2019, HHS promulgated regulations that are similar to those adopted by HHS in 1988 and upheld by *Rust*. But the 2019 rule is less restrictive in at least one important respect: a counselor providing nondirective pregnancy counseling "may discuss abortion" so long as "the counselor neither refers for, nor encourages, abortion." 42 C.F.R. § 59.14(e)(5). There is no "gag" on abortion counseling. *See id.*

---

[1] Congress did not design the Title X grant program to provide healthcare services beyond "family planning methods and services." 42 U.S.C. § 300(a); *cf.* Dissent at 81.

Plaintiffs, including several states and private Title X grantees, brought various suits challenging the 2019 rule, and three district courts in three states entered preliminary injunctions against HHS's enforcement of the rule.  In light of Supreme Court approval of the 1988 regulations and our broad deference to agencies' interpretations of the statutes they are charged with implementing, plaintiffs' legal challenges to the 2019 rule fail.  Accordingly, we vacate the injunctions entered by the district courts and remand for further proceedings consistent with this opinion.

I

In 1970, Congress enacted Title X of the Public Health Service Act to give HHS authority to make grants to Title X projects that provide specified family planning services.[2] Family Planning Services and Population Research Act, Pub. L. No. 91-572, 84 Stat. 1504, 1508 (1970); 42 U.S.C. § 300a-4(c).  The Act gives HHS broad authority to promulgate regulations to administer the grant program, as well as to impose conditions on the grants that HHS "may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made."  § 1006(a)–(b), 84 Stat. at 1507; 42 U.S.C. § 300a-4(a)–(b).

Congress placed only two limitations on HHS's discretion.  First, an individual's acceptance of family planning services has to be "voluntary" and not "a prerequisite to eligibility for or receipt of any other service or assistance from, or to participation in, any other program of

---

[2] Although Title X and its implementing regulations use both the terms "program" and "project," for consistency we refer to a program using Title X funds to provide services to clients as a "Title X project."

the entity or individual that provided such service or information."  § 1007, 84 Stat. at 1508; 42 U.S.C. § 300a-5. Second, § 1008 of Title X provides:

> None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.

§ 1008, 84 Stat. at 1508; 42 U.S.C. § 300a-6.

Section 1008, which has never been amended, "was intended to ensure that Title X funds would 'be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities.'"  *Rust*, 500 U.S. at 178–79 (quoting H.R. Conf. Rep. No. 91-1667, at 8 (1970)); *see also New York v. Sullivan*, 889 F.2d 401, 407 (2d Cir. 1989), *aff'd sub nom. Rust v. Sullivan*, 500 U.S. 173 (1991) (noting a legislator's statement that "[w]ith the 'prohibition of abortion' amendment—title X, section 1008—the [House] committee members clearly intend that abortion is not to be encouraged or promoted in any way through this legislation") (statement of Rep. Dingell).  As *Rust* concluded, in enacting § 1008, Congress made a constitutionally permissible "value judgment favoring childbirth over abortion."  500 U.S. at 192 (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977)).

Although the purpose of § 1008 is clear, the Supreme Court has determined that its language is ambiguous because it does not expressly articulate how its prohibition applies to abortion counseling, referral, and advocacy, or how to ensure that funds are not used "in programs where abortion is a method of family planning."  *Id.* at 184.  As a result of this

ambiguity, HHS has provided a range of alternative interpretations of § 1008 over the years. We provide an overview of this history as context to our analysis of the issues raised by the government's appeals.

A

In 1971, HHS promulgated (without notice and comment) the first regulations designed to implement Title X. Project Grants for Family Planning Services, 36 Fed. Reg. 18,465, 18,465–66 (Sept. 15, 1971). The regulations did not address the scope of § 1008. Instead, HHS interpreted § 1008 through opinions from its Office of General Counsel. In the mid-1970s, HHS issued a legal opinion prohibiting directive counseling on abortion ("encouraging or promoting" abortion) in a Title X project, while permitting nondirective ("neutral") counseling on abortion. *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992). Subsequent General Counsel opinions interpreted § 1008 as "prohibiting any abortion referrals beyond 'mere referral,' that is, providing a list of names and addresses without in any further way assisting the woman in obtaining an abortion." Statutory Prohibition on Use of Appropriated Funds Where Abortion is a Method of Family Planning, 53 Fed. Reg. 2922, 2923 (Feb. 2, 1988) (the 1988 Rule).

HHS revised its Title X regulations after notice and comment in 1980. *See* Grants for Family Planning Services, 45 Fed. Reg. 37,433 (June 3, 1980). But like the 1971 regulations, the 1980 regulations did not address the scope of § 1008. *Nat'l Family Planning*, 979 F.2d at 229 (citing 45 Fed. Reg. at 37,437). Instead, in 1981, HHS issued "Program Guidelines for Project Grants for Family Planning Services." *See* U.S. Dep't of Health & Human Servs.,

*Program Guidelines for Project Grants for Family Planning Services* (1981). For the first time, these guidelines required Title X projects to give Title X clients nondirective counseling on and referrals for abortion upon request. *Id.* § 8.6. The 1981 "guidelines were premised on a view that 'non-directive' counseling and referral for abortion were not inconsistent with [§ 1008] and were justified as a matter of policy in that such activities did not have the effect of promoting or encouraging abortion." 53 Fed. Reg. at 2923.

It was not until 1988 that HHS addressed the scope of § 1008 in notice-and-comment rulemaking. *See* 53 Fed. Reg. at 2922. The 1988 Rule recognized that "[f]ew issues facing our society today are more divisive than that of abortion." *Id.* Because § 1008 was intended to create "a wall of separation between Title X programs and abortion as a method of family planning," the 1988 Rule concluded that Congress intended Title X to circumscribe "family planning" to include "only activities related to facilitating or preventing pregnancy, not for terminating it." *Id.* at 2922–23. The 1988 Rule accordingly defined the term "family planning" as including "a broad range of acceptable and effective methods and services to limit or enhance fertility." *Id.* at 2944.

In light of these concerns, the 1988 Rule imposed specified limits on a Title X project. First, the project could not provide prenatal care. *Id.* at 2945. Therefore, "once a client served by a Title X project is diagnosed as pregnant, she must be referred for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child." *Id.*

Further, a Title X project could not "provide counseling concerning the use of abortion as a method of family

planning." *Id.* In the preamble to the 1988 Rule, HHS explained that counseling "which results in abortion as a method of family planning simply cannot be squared with the language of section 1008," and the 1988 Rule therefore rejected the 1981 program guidelines' requirement that Title X projects give nondirective counseling on abortion. *Id.* at 2923. In barring such nondirective counseling, HHS also relied on a General Accounting Office (GAO) report and Office of the Inspector General (OIG) audit of Title X projects indicating that some Title X projects were "promoting abortion" under the guise of providing nondirective counseling. *Id.* at 2924.[3]

Nor could a Title X project "provide referral for abortion as a method of family planning." *Id.* at 2945. Therefore, the list of available providers given to a pregnant client could not include "providers whose principal business is the provision of abortions." *Id.*

The 1988 Rule also required a Title X project to be organized "so that it is physically and financially separate" from activities prohibited by § 1008 and the regulations. *Id.* To meet this "program integrity" requirement, "a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient." *Id.*

---

[3] For example, the audit found that some Title X projects were providing clients with brochures prepared by abortion clinics, providing and witnessing the signing of consent forms required by abortion clinics, making appointments for clients at abortion clinics, and using Title X funds to pay the administrative costs for loans provided to clients to pay for abortions. 53 Fed. Reg. at 2924 n.7.

HHS explained that its rules requiring physical and financial separation were supported by OIG-audit and GAO-report findings that Title X projects were arguably violating § 1008 and that the lack of separation led to confusion as to whether federal funds were being used for abortion services. *Id.* Both OIG and GAO "urged [HHS] to give more specific, formalized direction to programs about the extent of prohibition on abortion as a method of family planning." *Id.* at 2923–24.

After HHS promulgated the 1988 Rule, Title X grantees challenged the facial validity of the regulations on the grounds that the regulations were not authorized by Title X, were arbitrary and capricious under the Administrative Procedure Act (APA), and violated the First and Fifth Amendment rights of Title X clients and the First Amendment rights of Title X health care providers. The Supreme Court addressed these challenges in *Rust*.

*Rust* first rejected the plaintiffs' claim "that the regulations exceed [HHS]'s authority under Title X and are arbitrary and capricious." *Id.* at 183. Because the language of § 1008 was "ambiguous" as to "the issues of counseling, referral, advocacy, or program integrity," the Court gave "substantial deference" to HHS's interpretation under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), and concluded that "[t]he broad language of Title X plainly allows [HHS]'s construction of the statute." *Rust*, 500 U.S. at 184. "By its own terms, § 1008 prohibits the use of Title X funds 'in programs where abortion is a method of family planning'" but "does not define the term 'method of family planning,' nor does it enumerate what types of medical and counseling services are entitled to Title X funding." *Id.* In light of the

"broad directives provided by Congress in Title X in general and § 1008 in particular," *Rust* concluded that HHS's "construction of the prohibition in § 1008 to require a ban on counseling, referral, and advocacy within the Title X project" was permissible. *Id.*

*Rust* likewise upheld the program integrity requirements, which mandated separate facilities, personnel, and records. The Court concluded that the requirements were "based on a permissible construction of the statute" and were "not inconsistent with congressional intent." *Id.* at 188. *Rust* noted that "if one thing is clear from the legislative history, it is that Congress intended that Title X funds be kept separate and distinct from abortion-related activities." *Id.* at 190. As such, *Rust* declined to upset HHS's "reasoned determination that the program integrity requirements are necessary to implement the prohibition" in § 1008. *Id.*

*Rust* also rejected the plaintiffs' argument that the regulations were arbitrary and capricious because "they 'reverse a longstanding agency policy that permitted nondirective counseling and referral for abortion'" and constitute "a sharp break from [HHS]'s prior construction of the statute." *Id.* at 186. According to the Court, HHS's revised interpretation was entitled to deference because "the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Id.* (quoting *Chevron*, 467 U.S. at 863–64). HHS gave a reasoned basis for its change of interpretation, including that the new regulations were "more in keeping with the original intent of the statute." *Id.* at 187.

*Rust* then turned to the constitutional arguments. The Court rejected the argument that the restrictions violated the

First Amendment speech rights of grantees, their staff, and clients, holding that the regulations permissibly implemented Congress's decision to allocate public funds "to subsidize family planning services which will lead to conception and childbirth, and declin[e] to promote or encourage abortion." *Id.* at 193 (internal quotation marks omitted). "Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use," and "the regulations are narrowly tailored to fit Congress' intent in Title X that federal funds not be used to 'promote or advocate' abortion as a 'method of family planning.'" *Id.* at 195 n.4. Doctors were "always free to make clear that advice regarding abortion is simply beyond the scope of the [Title X] program." *Id.* at 200. *Rust* also rejected arguments that the restrictions violated a woman's Fifth Amendment right to choose whether to obtain an abortion because "[the] decision to fund childbirth but not abortion 'places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but rather, by means of unequal subsidization of abortion and other medical services, encourages alternative activity deemed in the public interest.'" *Id.* at 201 (quoting *Harris v. McRae*, 448 U.S. 297, 315 (1980)). The regulations did not infringe the doctor-patient relationship, the Court held, because the doctor and patient remained free to discuss abortion and abortion-related services "outside the context of the Title X project." *Id.* at 203. Accordingly, *Rust* upheld the 1988 Rule.

Within months after *Rust* was decided, legislators introduced the Family Planning Amendments Act of 1992, H.R. 3090, 102d Cong. (1991), which sought to undo the 1988 Rule and to codify the 1981 program guidelines, *see* S. Rep. No. 102-86 (1991). Under the proposed legislation,

every applicant for a Title X grant had to agree to offer "nondirective counseling and referrals regarding—(i) prenatal care and delivery; (ii) infant care, foster care, and adoption; and (iii) termination of pregnancy." H.R. 3090, 102d Cong. § 2 (1991); S. 323, 102d Cong. § 2 (1991); H.R. Rep. No. 102-767, at 2 (1992). The bill failed to obtain the necessary votes. *See* S. 323, 102d Cong., Roll No. 452 (Oct. 2, 1992).

After this legislative effort to overturn *Rust* failed, President Clinton issued a memorandum directing HHS to suspend the 1988 Rule. *See* The Title X "Gag Rule," 58 Fed. Reg. 7455 (Jan. 22, 1993). Two weeks later (without notice or comment) HHS issued an interim rule suspending the 1988 Rule and announcing that the nonregulatory interpretations that existed prior to the 1988 Rule, including those in the 1981 program guidelines, would apply. *See* Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 7462 (Feb. 5, 1993). Legislators introduced another bill, the Family Planning Amendments Act of 1995, H.R. 833, 104th Cong. (1995), which included the same language as the amendments proposed in 1991, and would have required nondirective counseling on and referral for the "termination of pregnancy." H.R. 833, 104th Cong. § 2(b)(3) (1995). As before, these efforts were unsuccessful.

Around this same time, Congress was debating whether to appropriate funds for Title X projects. *See* 141 Cong. Rec. H8194-02, at 8249–62 (Aug. 2, 1995). In response to concerns that Title X clinics were pressing teenagers to obtain abortions, *see id.* at H8260 (Rep. Waldholtz), legislators proposed a compromise bill that would ensure no federal funds were used to support abortion services. As ultimately enacted, the 1996 appropriations rider provided (among other

things) "[t]hat amounts provided to [Title X] projects . . . shall not be expended for abortions, [and] that all pregnancy counseling shall be nondirective." Pub. L. No. 115-245, 132 Stat. 2981, 3070–71. A version of this rider has been reenacted each year since 1996.

In the wake of the defeat of the Family Planning Amendments Acts of 1992 and 1995, HHS issued a new regulation adopting the language of the failed legislation. *See* Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 65 Fed. Reg. 41,270 (July 3, 2000) (the 2000 Rule). The 2000 Rule provided that a Title X project was required to offer a pregnant woman "neutral, factual information and nondirective counseling" on "each of the following options: (A) Prenatal care and delivery; (B) Infant care, foster care, or adoption; and (C) Pregnancy termination." *Id.* at 41,279. Each Title X project also had to provide referral for each option "upon request." *Id.*

The 2000 Rule eliminated several of the 1988 Rule's provisions. For instance, the 2000 Rule dropped the 1988 Rule's definition of "family planning" but did not provide a replacement definition. *See id.* at 41,278. Instead, the 2000 Rule simply stated that a family planning project must "[p]rovide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including infertility services and services for adolescents)." *Id.*

at 41,278–79.  The 2000 Rule also eliminated the physical and financial separation requirement.  *See id.* at 41,276.[4]

While HHS's oscillations in interpreting § 1008 were playing out, Congress enacted various laws (referred to as federal conscience laws) prohibiting discrimination against individuals and entities who objected to performing or promoting abortion on religious or moral grounds.  Beginning in 1973, Congress enacted four statutes (collectively referred to as the Church Amendments) that prevent the government from conditioning grant funds on assistance with abortion-related activities, 42 U.S.C. § 300a-7(b), and prohibit grant recipients from discriminating against individuals who refused to assist with abortion because of their "religious beliefs or moral convictions," *id.* § 300a-7(c).  In 1996, Congress enacted the Coats-Snowe Amendment to the Public Health Service Act, which prohibits the federal government from discriminating against any health care entity because it refuses to engage in certain abortion-related activities, including providing referrals for abortions.  Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, tit. V, § 515, 110 Stat. 1321, 1321-245 (1996) (codified at 42 U.S.C. § 238n(a)).  Finally, in 2004 Congress began including a rider in health care appropriations bills to prohibit discrimination by recipients of federal grants against health care entities that refused to make referrals for abortion, among other things.  Consolidated Appropriations

---

[4] In promulgating the 2000 Rule, HHS did not go as far as some commenters urged.  In rejecting comments that it should read § 1008 narrowly as prohibiting only "the provision of, or payment for, abortions" and nothing else, HHS stated that this was *not* "the better reading of the statutory language."  65 Fed. Reg. at 41,272.  HHS also acknowledged that the 1988 Rule was "a permissible interpretation" of § 1008.  *Id.* at 41,277.

28          STATE OF CALIFORNIA V. AZAR

Act, 2005, Pub. L. No. 108-447, 118 Stat. 2890, 3163 (2004) (referred to as the Weldon Amendment).**[5]**

In 2008, HHS concluded that the 2000 Rule's requirement that Title X projects *must* provide counseling and referrals for abortion upon request was inconsistent with these federal conscience laws. Therefore, HHS promulgated regulations to clarify it "would not enforce this Title X regulatory requirement on objecting grantees or applicants." Ensuring that Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78,072, 78,087 (Dec. 19, 2008) (the 2008 nondiscrimination regulations). After a new administration took office, HHS decided these regulations were "unclear and potentially overbroad in scope" and rescinded them. Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 Fed. Reg. 9968, 9969 (Feb. 23, 2011).

Thus, before the 2018 rulemaking, HHS's interpretations of § 1008 had seesawed through multiple formulations: from permitting—then requiring—nondirective counseling on abortion as a method of family planning (in 1971 and 1981 guidance documents); to prohibiting counseling and referrals for abortion as a method of family planning (in the 1988 Rule, upheld by the Supreme Court in 1991); and then to once again requiring nondirective counseling and referrals for abortion on request (in the 2000 Rule). HHS also vacillated in its interpretation of the federal conscience laws. This

---

**[5]** The Weldon Amendment has been continuously enacted since 2004. *See, e.g.*, Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019, Pub. L. 115-245, 132 Stat. 2981, 3118.

uncertain history was the backdrop for HHS's reconsideration of this controversial area in 2018.

B

In 2018, HHS returned to the task of interpreting § 1008 and issued a notice of proposed rulemaking "to ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning." Compliance with Statutory Program Integrity Requirements, 83 Fed. Reg. 25,502, 25,502 (June 1, 2018). After receiving over 500,000 comments reflecting a "sharp diversity of opinion," HHS issued a final rule in March 2019. Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714, 7723 (Mar. 9, 2019) (the Final Rule). The Final Rule largely represents a return to the 1988 Rule that the Supreme Court upheld in *Rust*.

The Final Rule's definition of the statutory term "family planning" is substantially similar to the 1988 Rule's definition. It "means the voluntary process of identifying goals and developing a plan for the number and spacing of children," including by means of "a broad range of acceptable and effective family planning methods and services." 84 Fed. Reg. at 7787; 42 C.F.R. § 59.2 (2019). Like the 1988 Rule, the Final Rule states that family planning services "include preconception counseling" but not "postconception care (including obstetric or prenatal care) or abortion as a method of family planning." 84 Fed. Reg. at 7787; 42 C.F.R. § 59.2.

In the preamble to the Final Rule, HHS explained that it adopted this definition of "family planning" to "address in part its concern that the requirement for abortion referrals, as

provided in the 2000 [Rule], violates or leads to violations of section 1008's prohibition on funding Title X projects where abortion is a method of family planning." 84 Fed. Reg. at 7729. HHS also explained it was reestablishing the 1988 Rule's requirement that family planning methods and services be "acceptable and effective," omitting the 2000 Rule's requirement that they also be "medically approved," because the term "medically approved" lacked clear meaning in this context and does not appear in the statute. *Id.* at 7740–41.

Repeating the language of Title X, *see* 42 U.S.C. § 300(a), the Final Rule provides that a family planning project must "[e]ncourage family participation in the decision to seek family planning services," 42 C.F.R. § 59.5(a)(14). In the preamble, HHS noted that this language was required by the Title X statute itself and that Congress had enacted an appropriations rider that "specifically emphasizes that grantees encourage family participation 'in the decision of minors to seek family planning services.'" 84 Fed. Reg. at 7718 (quoting Pub. L. No. 115-245, div. B, sec. 207, 132 Stat. 2981, 3070 (2018)).

The Final Rule also sets forth requirements and limitations for post-conception services. *See* 42 C.F.R. § 59.14. Under the Rule, once a client is verified as being pregnant, the client "shall be referred to a health care provider for medically necessary prenatal health care." *Id.* § 59.14(b)(1). The regulations explain that "[p]rovision of a referral for prenatal health care is consistent with [Title X] because prenatal care is a medically necessary service." *Id.* § 59.14(e)(1).

The Final Rule differs from the 1988 Rule with respect to pregnancy counseling. HHS noted that the 1996

STATE OF CALIFORNIA V. AZAR                    31

appropriations rider, as reenacted annually, required "that all pregnancy counseling shall be nondirective."[6]  84 Fed. Reg. at 7725 n.36, 7729.  Interpreting the rider's language as permitting such counseling, *id*. at 7725, the Final Rule states that a Title X project can give a pregnant client nondirective pregnancy counseling "when provided by physicians or advanced practice providers."  42 C.F.R. § 59.14(b)(1)(i).[7]

---

[6] The appropriations rider for 2018 provides:

> For carrying out the program under title X of the [Public Health Service] Act to provide for voluntary family planning projects, $286,479,000:  *Provided*, That amounts provided to said projects under such title shall not be expended for abortions, that all pregnancy counseling shall be nondirective, and that such amounts shall not be expended for any activity (including the publication or distribution of literature) that in any way tends to promote public support or opposition to any legislative proposal or candidate for public office.

Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3070–71 (2018).

[7] The Final Rule defines "Advanced Practice Provider" as:

> [A] medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients.  The term Advanced Practice Provider includes physician assistants and advanced practice registered nurses (APRN).  Examples of APRNs that are an Advanced Practice Provider include certified nurse practitioner (CNP), clinical nurse specialist (CNS), certified registered nurse anesthetist (CRNA), and certified nurse-midwife (CNM).

42 C.F.R. § 59.2.

Unlike the 1988 Rule, the Final Rule establishes that a counselor providing nondirective pregnancy counseling "may discuss abortion" so long as "the counselor neither refers for, nor encourages, abortion." *Id.* § 59.14(e)(5). To ensure compliance with federal conscience laws, however, a Title X provider is not required to discuss abortion upon request. *See* 84 Fed. Reg. at 7716, 7746–47. In short, the Final Rule does not impose a "gag" on abortion counseling: a counselor "may discuss abortion" but is not required to do so. 42 C.F.R. § 59.14(e)(5).[8]

---

[8] The dissent relies heavily on its mistaken view that the Final Rule is a "Gag Rule" that "gags health care providers from fully counseling women about their options while pregnant." Dissent at 81. The dissent conjures up a "Kafkaesque" situation where counselors have to "walk on eggshells to avoid a potential transgression" of the Final Rule and in response to questions about terminating a pregnancy can merely say: "I can't help you with that or discuss it. Here is a list of doctors who can assist you with your pre-natal care despite the fact that you are not seeking such care." Dissent at 85–86 (citation omitted). But this "Kafkaesque" scenario is belied by the Final Rule itself, which expressly authorizes counseling on abortion while prohibiting referrals for abortion. Indeed, the Final Rule provides its own example of a straightforward conversation with a client who asks about abortion:

> [When a] pregnant woman requests information on abortion and asks the Title X project to refer her for an abortion[, then] [t]he counselor tells her that the project does not consider abortion a method of family planning and, therefore, does not refer for abortion. The counselor offers her nondirective pregnancy counseling, *which may discuss abortion*, but the counselor neither refers for, nor encourages, abortion.

42 U.S.C. § 59.14(e)(5) (emphasis added). The dissent's arguments that the Final Rule is a "Gag Rule" is merely a restatement of its disagreement with the Final Rule's interpretation of § 1008 as precluding "referral for abortion as a method of family planning." 84 Fed. Reg. at 7717.

Although the Final Rule permits a Title X project to provide nondirective counseling that includes information about abortion, it expressly prohibits referrals for abortion as a method of family planning. HHS explained its understanding that "referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning." 84 Fed. Reg. at 7717. Accordingly, "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 42 C.F.R. § 59.14(a). Further, "[a] Title X project may not use the provision of any prenatal, social service, emergency medical, or other referral, of any counseling, or of any provider lists, as an indirect means of encouraging or promoting abortion as a method of family planning." *Id.* § 59.14(c)(1).

While referrals for abortion as a method of family planning are not allowed, the Title X project may give a pregnant client a "list of licensed, qualified, comprehensive primary health care providers," which may include "providers of prenatal care[], some, but not the majority, of which also provide abortion as part of their comprehensive health care services." *Id.* § 59.14(c)(2). "Neither the list nor project staff may identify which providers on the list perform abortion." *Id.* The Title X project may also provide referrals for abortion when such a procedure is medically necessary. 84 Fed. Reg. at 7748.

Finally, the Final Rule, like the 1988 Rule, requires that a Title X project be organized "so that it is physically and financially separate . . . from activities that are prohibited

under section 1008 of the Public Health Service Act and §§ 59.13, 59.14, and 59.16 of these regulations." 42 C.F.R. § 59.15. HHS explained that the physical and financial separation requirements were necessary to avoid the risk "of the intentional or unintentional use of Title X funds for impermissible purposes, the co-mingling of Title X funds, the appearance and perception that Title X funds being used in a given program may also be supporting that program's abortion activities, and the use of Title X funds to develop infrastructure that is used for the abortion activities of Title X clinics." 84 Fed. Reg. at 7764.

The effective date of the Final Rule was set for May 3, 2019, but the compliance deadline for the physical separation requirements is March 4, 2020. *Id.* at 7714.

## C

Before the Final Rule's effective date, several states and private Title X grantees (collectively, plaintiffs) filed lawsuits against HHS in three different district courts seeking preliminary injunctive relief. The lawsuits challenged the Final Rule under the APA as arbitrary and capricious, contrary to law, and in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C).[9] All three district courts granted plaintiffs' preliminary injunction motions on similar grounds. *See Washington v. Azar*, 376 F. Supp. 3d 1119 (E.D. Wash.

---

[9] Plaintiffs also brought various constitutional claims, but the district courts did not base their preliminary injunctions on these claims. Plaintiffs do not raise these claims as alternative grounds for affirming the district courts' grants of injunctive relief, so any such argument was waived. *See United States v. Gamboa-Cardenas*, 508 F.3d 491, 502 (2007).

2019); *California v. Azar*, 385 F. Supp. 3d 960 (N.D. Cal. 2019); *Oregon v. Azar*, 389 F. Supp. 3d 898 (D. Or. 2019). HHS timely appealed each of the preliminary injunction orders.[10]

We review a district court's grant of a preliminary injunction "for an abuse of discretion." *Gorbach v. Reno*, 219 F.3d 1087, 1091 (9th Cir. 2000) (en banc). But "legal issues underlying the injunction are reviewed de novo because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018) (citation omitted).

## II

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). The first factor—likelihood of success on the merits—"is the most important" factor. *Id.* If a movant fails

---

[10] HHS also moved to stay the injunctions pending a decision on the merits of its appeals. We granted the stay motion in a published order. *See California v. Azar*, 927 F.3d 1068 (9th Cir. 2019) (per curiam). Upon the vote of a majority of nonrecused active judges, we ordered reconsideration en banc of the stay motion, *California v. Azar*, 927 F.3d 1045, 1046 (9th Cir. 2019) (mem.), but we did not vacate the stay order itself, so it remained in effect, *California v. Azar*, 928 F.3d 1153, 1155 (9th Cir. 2019) (mem.). The stay motion is now denied as moot.

to establish likelihood of success on the merits, we need not consider the other factors. *Id.*

The Supreme Court has recognized that when an issue of law is key to resolving a motion for injunctive relief, the reviewing court has the power "to examine the merits of the case" and resolve the legal issue. *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (internal quotation marks omitted) (quoting *N.C. R. Co. v. Story*, 268 U.S. 288, 292 (1925)). "Adjudication of the merits is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail." *Id.*; *accord Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1297 (9th Cir. 1998). The Supreme Court reaffirmed this conclusion in *Winter*, noting that it could "address the underlying merits of plaintiffs' [legal] claims" in the preliminary injunction appeal and proceed to a decision. 555 U.S. at 31; *see also Blockbuster Videos*, 141 F.3d at 1297; *Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 931 (9th Cir. 1988).

This approach applies in appropriate APA cases. *See Beno v. Shalala*, 30 F.3d 1057, 1063–64 (9th Cir. 1994). In *Beno*, we considered plaintiffs' claim that an agency's action was "'arbitrary and capricious' within the meaning of the APA." *Id.* at 1063. The APA claim required only review of the administrative record and interpretation of relevant statutes; "additional fact-finding [was] not necessary to resolve th[e] claim." *Id.* at 1064 n.11. Because "the district court's denial of injunctive relief rested primarily on interpretations of law, not on the resolution of factual issues," we reviewed de novo the district court's legal conclusions and addressed plaintiffs' claims on the merits. *Id.* at 1063–64 (internal quotation marks omitted). We held this was appropriate because "in APA cases, a district court decision

is generally accorded no particular deference, and is reviewed de novo because the district court is in no better position than this court to review the administrative record." *Id.* at 1063 n.9 (internal quotation marks and citations omitted). This approach is consistent with the Supreme Court's ruling that district courts' "factfinding capacity" is "typically unnecessary to judicial review of agency decisionmaking" because both the district court and the court of appeals "are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

Here, the only significant issues raised are legal. Plaintiffs argue that the Final Rule is invalid on its face because it conflicts with other statutes and the agency acted in an arbitrary and capricious manner in promulgating it. An agency's action violates the APA when it is "in excess of statutory jurisdiction [or] authority," 5 U.S.C. § 706(2)(C), or when it is "not in accordance with law," *id.* § 706(2)(A), for instance, when it violates another statute, *see FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). The record before us is sufficient to resolve plaintiffs' challenges, and no additional factual development is required.[11] The district courts issued preliminary injunctions

---

[11] Although the parties did not submit the full administrative record (which includes over 500,000 public comments) to the district courts, all public comments made during the rulemaking process are available online and were available to the parties in raising arguments to the district courts. *See Compliance with Statutory Program Integrity Requirements*, regulations.gov (last visited Oct. 29, 2019), https://www.regulations.gov/document?D=HHS-OS-2018-0008-0001; 84 Fed. Reg. at 7722 & n.26. Indeed, the parties used selected public comments to support their arguments in their briefs both to the district courts and to us. Despite this,

based on their view that plaintiffs were likely to prevail on the merits of these legal claims, and thus the district courts were not in any better position to decide these issues than we are. *See Beno*, 30 F.3d at 1063 n.9.[12] We have received extensive briefing and heard argument on the issues presented. Because we can decide, based on the record

the dissent asserts that "[d]eciding the merits of [p]laintiffs' arbitrary and capricious claim is . . . premature" because "[w]e do not have the complete administrative record." Dissent at 95–96. But neither plaintiffs nor the dissent identify additional arguments that could be made after submission of the full record, *see* Dissent at 95–96; at most, plaintiffs stated at oral argument (but not in their briefing) that they might delve deeper into the approximately 500,000 public comments to provide additional support for their existing arguments. Because HHS did not omit or withhold material information from the administrative record, the cases on which the dissent relies are inapposite. *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984) (holding that review could not go forward on a partial record where doing so "would be fundamentally unfair" because agency had withheld significant information); *Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 292 (D.C. Cir. 1975) (remanding to district court for further review where agency omitted a key document that "throws light on the factors and considerations relied upon" by the agency from the administrative record). Accordingly, we conclude that the record before us is sufficient to resolve plaintiffs' arguments that aspects of the Final Rule are arbitrary and capricious. *See McChesney v. FEC*, 900 F.3d 578, 583 (8th Cir. 2018); 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party.").

[12] In considering plaintiffs' claims that HHS's action was arbitrary and capricious, the district courts properly limited their review to the record before them. *See California*, 385 F. Supp. 3d at 1000–18; *Washington*, 376 F. Supp. 3d at 1131; *Oregon*, 389 F. Supp. 3d at 914–19. While the district courts made factual findings and predictions to support their conclusion that plaintiffs showed a likelihood of irreparable harm, *see, e.g.*, *California*, 385 F. Supp. 3d at 978–85, *see also* Fed. R. Civ. P. 52(a), these findings are not relevant to the resolution of the arbitrary and capricious challenge, *see Fla. Power & Light Co.*, 470 U.S. at 744.

provided, "whether the action passes muster under the appropriate APA standard of review," *Fla. Power & Light Co.*, 470 U.S. at 744, we may resolve the legal issues on their merits, *Beno*, 30 F.3d at 1064.

### III

We first consider plaintiffs' argument that the Final Rule is facially invalid. Plaintiffs wisely do not press the argument that the Final Rule is an impermissible interpretation of the text of § 1008. *Rust* held that "[t]he broad language of Title X plainly allows [the 1988 Rule's] construction of the statute," 500 U.S. at 184, and the Final Rule is substantially the same as the 1988 Rule with respect to the provisions at issue here.

Rather, plaintiffs mainly argue that two intervening congressional enactments altered the legal landscape so that *Rust*'s holding is no longer valid. First, plaintiffs point to the 1996 appropriations rider enacted to ensure no federal funds were used to support abortion services. *See* Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3070–71 (2018). Second, plaintiffs rely on a section of the Patient Protection and Affordable Care Act (ACA) that limits HHS's ability to promulgate regulations. *See* Pub. L. No. 111-148, § 1554, 124 Stat. 119, 259 (2010) (codified at 42 U.S.C. § 18114).

In considering these arguments, we are mindful that the Supreme Court's "interpretive decisions, in whatever way reasoned, effectively become part of the statutory scheme." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015). Therefore, *Rust*'s conclusion that § 1008 could be interpreted to bar abortion counseling, referral, and advocacy within a Title X project became a part of Title X's scheme, and we

may not lightly infer that Congress intended to overrule that holding in enacting the appropriations rider or § 1554 of the ACA. Because "[t]he modification by implication of [a] settled construction of an earlier and different section" by a later enactment "is not favored," *United States v. Madigan*, 300 U.S. 500, 506 (1937), plaintiffs must provide evidence that Congress intended to alter *Rust*'s conclusion that the 1988 Rule was a permissible interpretation of Title X and § 1008. They fail to do so.

### A

We first turn to plaintiffs' argument that the Final Rule violates the 1996 appropriations rider. At the time HHS promulgated the Final Rule, the appropriations rider provided that "amounts provided to [the Title X project] shall not be expended for abortions, [and] that all pregnancy counseling shall be nondirective." Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3070–71 (2018). HHS interpreted this appropriations rider as permitting Title X projects to provide counseling on abortion, and incorporated this interpretation in the Final Rule. *See* 84 Fed. Reg. at 7725; 42 C.F.R. § 59.14(e)(5).

Plaintiffs' argument about the correct interpretation of this provision proceeds in three steps. First, according to plaintiffs, the term "pregnancy counseling" must be interpreted as including referrals. Second, plaintiffs contend that the term "nondirective" means the presentation of all options on an equal basis. Third, putting these two definitions together, plaintiffs argue that the term "nondirective pregnancy counseling" requires the provision of referrals for abortion on the same basis as referrals for prenatal care and adoption. Because the Final Rule requires

referrals for medically necessary prenatal health care and permits referrals for adoption but precludes referrals for abortion, *see* 42 C.F.R. § 59.14, plaintiffs contend that the Final Rule does not provide nondirective pregnancy counseling, and thus violates the appropriations rider. We consider each of these steps in turn.

1

At the first step, plaintiffs and the dissent argue that the statutory term "pregnancy counseling" must be interpreted as including referrals.[13] Congress has not provided a definition of the term "pregnancy counseling," or otherwise "directly addressed the precise question at issue." *Chevron*, 467 U.S. at 843. In the face of Congressional silence, we give "substantial deference" to the interpretations provided by HHS. *Rust*, 500 U.S. at 184.[14]

In the Final Rule, HHS provided its interpretation by treating the terms "counseling" and "referral" as referring to distinct legal concepts. *See* 84 Fed. Reg. at 7716–17. While a counselor may "provide *nondirective pregnancy counseling* to pregnant Title X clients on the patient's pregnancy options, *including abortion*," *id.* at 7724 (emphasis added), the Final Rule prohibits any "referral for abortion as a method of family planning," *id.* at 7717.

---

[13] As HHS recognized, the appropriations rider amended Title X by expressly requiring all pregnancy counseling to be nondirective. 84 Fed. Reg. at 7725, 7729. Congress "may amend substantive law in an appropriations statute, as long as it does so clearly." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992).

[14] HHS is the agency authorized to promulgate regulations to implement Title X, *see* 42 U.S.C. § 300a-4(a).

In its brief on appeal, HHS made explicit the Final Rule's implicit interpretation of "counseling."[15] According to HHS, under the Final Rule and as a matter of common usage, "counseling and referrals are distinct" because "'[p]regnancy counseling' involves providing information about medical options, which is different from referring a patient to a specific doctor for a specific form of medical care."

HHS's interpretation of the phrase "pregnancy counseling" as a concept that is distinct from the term "referrals" is reasonable and consistent with common usage. The dictionary indicates that counseling does not include referrals. The dictionary definition of the term "counseling" is "a practice or professional service designed to guide an individual to a better understanding of [her] problems and potentialities . . . ." *Counseling*, Webster's Third New International Dictionary 518 (2002); *see also Counseling*, The American Medical Association Encyclopedia of Medicine

---

[15] We may defer to an interpretation made in a legal brief so long as it is not a post hoc rationalization "advanced by an agency seeking to defend past agency action against attack." *Auer v. Robbins*, 519 U.S. 452, 462 (1997). As in *Auer,* there is no reason here to think that HHS's position is a "post hoc rationalization." *Id.* Indeed, HHS has long treated "counseling" and "referral" as distinct concepts. The 1981 guidelines and the 2000 Rule both provided that Title X projects were required to provide "nondirective counseling on each of the options [including pregnancy termination], *and referral upon request.*" 65 Fed. Reg. at 41,279; *Program Guidelines for Project Grants for Family Planning Services*, § 8.6 (1981) (emphasis added); *see also* 53 Fed. Reg. at 2923 (explaining that the 1981 guidelines required providers to furnish "nondirective 'options couns[e]ling"—including "on pregnancy termination (abortion)"—"followed by referral for these services if [the patient] so requests"). And the 2000 Rule treated "non-directive counseling," *see* 65 Fed. Reg. at 41,272–74, as distinct from "[r]eferral[s] for abortion, *see id.* at 41,274.

317 (1989) (defining "counseling" as "[a]dvice and psychological support given by a health professional and usually aimed at helping a person cope with a particular problem"). By contrast, "referral" is defined as "the process of directing or redirecting (as a medical case, a patient) to an appropriate specialist or agency for definitive treatment." *Referral*, Webster's Third New International Dictionary 1908 (2002). As in *Rust*, "[t]he broad language of Title X," as amended by the 1996 appropriations rider, "plainly allows [HHS]'s construction of the statute." 500 U.S. at 184.

Plaintiffs' and the dissent's argument that the term "pregnancy counseling" must be interpreted as including referrals is primarily based on their reading of a separate statute enacted by Congress, the Children's Health Act of 2000, Pub. L. No. 106-310, 114 Stat. 1101 (2000); *see* Dissent at 90–91. A provision of that Act, the "Infant Adoption Awareness" section, 42 U.S.C. § 254c-6, requires HHS to make grants to adoption organizations "for the purpose of developing and implementing programs to train the designated staff of eligible health centers in providing adoption information and referrals to pregnant women on an equal basis with all other courses of action included in nondirective counseling to pregnant women." 42 U.S.C. § 254c-6(a)(1). According to plaintiffs and the dissent, this language shows Congress intended that referrals be "included in nondirective counseling" and that all options, including abortion, should be presented on an equal basis. *See* Dissent at 90–91.

This argument fails. The Infant Adoption Awareness section neither provides a definition of "nondirective counseling" nor "expressly states" that nondirective

counseling "encompasses referrals." *Cf.* Dissent at 87 n.4.[16] Simply put, the section does not show that referrals are a type of nondirective counseling. Indeed, it does not impose any requirements or limitations on nondirective pregnancy counseling at all; rather, it provides funds to adoption organizations to enable them to offer training to the staff of health centers regarding the provision of adoption information and referrals to clients. HHS could reasonably conclude that this section does not indicate that it considers referrals to be a type of counseling, as opposed to something that may occur at the same time as counseling. 84 Fed. Reg. at 7733. Given that the Infant Adoption Awareness section is not part of Title X, does not use language similar to that in the 1996 appropriations rider, and was enacted for a substantially different purpose, it sheds no light on Congress's intent in enacting the appropriations rider or on the interpretation of its statutory language. *Cf. Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) (per curiam) (providing that it is appropriate to interpret the language of two separate statutes pari passu where two statutes use similar language and were enacted for the same purpose).[17]

---

[16] Although the dissent claims that Congress "clarified the meaning of the term 'nondirective'" and that Congress's "intent is clear," in fact, the dissent merely offers its own interpretation of what the term means in context. Dissent at 90.

[17] In addition to discussing the Infant Adoption Awareness section, 42 U.S.C. § 254c-6(a)(1), both the plaintiffs and HHS point to other statutes that reference counseling and referrals. HHS notes that Congress has frequently referred to counseling and referrals separately, showing that the two are legally distinct concepts. *See, e.g.*, 42 U.S.C. § 300z-10(a) ("Grants or payments may be made only to . . . projects which do not provide abortions or abortion counseling or referral . . . ."); *id.* § 300z-3(b) (referring to "counseling and referral services"); 18 U.S.C. § 248(e)(5)

Plaintiffs' and the dissent's second argument, that industry practice requires interpreting "counseling" as including referrals, also fails, because the sources on which plaintiffs rely shed no light on the proper interpretation of the term "nondirective pregnancy counseling." Dissent at 87 n.4. Plaintiffs first point to HHS's guidelines in *Providing Quality Family Planning Services* (the QFP), which state that during a "visit [to] a provider of family planning services," pregnancy-test results "should be presented to the client, followed by a discussion of options and appropriate referrals." U.S. Dep't of Health & Human Servs., *Providing Quality Family Planning Services*, Morbidity & Mortality Wkly. Rep., Apr. 25, 2014, at 13–14. Rather than requiring an interpretation of counseling as including referrals, this language suggests that counseling (i.e., "discussion of options") and referrals are distinct. Plaintiffs also point to a letter submitted by the American Medical Association (AMA) during the notice-and-comment period on the Final Rule. In this letter, the AMA listed several provisions in its *Code of Medical Ethics* which it claimed made it unethical for a practitioner to refrain from providing "all appropriate

---

("reproductive health services" includes "counseling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy"). Plaintiffs identify other statutes that suggest referrals can occur during the course of counseling. *See, e.g.*, 42 U.S.C. § 300ff-33 ("post-test counseling (including referrals for care)" provided to individuals with positive HIV/AIDS test); *id.* § 3020e-1(b) (referring to "pension counseling and information programs" that "provide outreach, information, counseling, referral, and other assistance"); 20 U.S.C. § 1161k(c)(4)(A) (requiring college counselors to provide "referrals to and follow-up with other student services staff"). Because these statutes do not use the same language as the appropriations rider and were not enacted for the same purpose, they do not assist us in interpreting Congress's direction "that all pregnancy counseling shall be nondirective." *See* 84 Fed. Reg. at 7745.

referrals, including for abortion services." But the provisions of the code cited in the letter do not even discuss referrals, let alone define the term; rather, they state that patients have a right "to receive information from their physicians and to have the opportunity to discuss the benefits, risks, and costs of appropriate treatment alternatives" and "to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment." These sources do not show that the term "referrals" is included in the phrase "nondirective pregnancy counseling."[18]

Because HHS can reasonably interpret "nondirective pregnancy counseling" as not including referrals, *see* 84 Fed. Reg. at 7716, plaintiffs fail at the first step of their arguments, that "pregnancy counseling" must be deemed to include referrals.

2

Plaintiffs also fail at the second step of their argument: that the term "nondirective" means the presentation of all options on an equal basis. Neither Title X nor the appropriations rider defines "nondirective." Again, because Congress has "not directly addressed the precise question at issue," *Chevron*, 467 U.S. at 843, we must give substantial deference to HHS's interpretation. *Rust*, 500 U.S. at 184. In the Final Rule, HHS filled the Congressional silence by interpreting "nondirective pregnancy counseling" to mean

---

[18] The dissent does not address these sources and merely asserts, without explanation, that "industry understanding recognizes that counseling includes referrals." Dissent at 87 n.4 (citing *California*, 385 F. Supp. 3d at 989).

"the meaningful presentation of options where the physician or advanced practice provider (APP) is 'not suggesting or advising one option over another.'" 84 Fed. Reg. at 7716 (quoting 138 Cong. Rec. H2822-02, 2826 (statement of Rep. Lloyd)).

Under this definition, "nondirective" does not mean the presentation of all possible medical options. Rather, "nondirective" means that options must be provided in a neutral manner, without suggesting or advising one option over another. Thus, a physician or APP providing nondirective counseling to a client does not have to discuss every possible option available to that client, but must present options in a neutral manner and refrain from encouraging the client to select a particular option. In other words, HHS interpreted "nondirective" to refer to the neutral manner in which counseling is provided rather than to the scope of topics that must be covered in counseling. 84 Fed. Reg. at 7716.

This is a reasonable interpretation of "nondirective." It is consistent with HHS's longstanding distinction between "nondirective" counseling that is "neutral" and "directive" counseling that encourages or promotes abortion. *Nat'l Family Planning*, 979 F.2d at 229. And it is consistent with the dictionary definition of the term "nondirective" as a type of counseling where "the counselor refrains from interpretive or associative comment but usually by repeating phrases used by the client encourages [the client] to express, clarify, and restructure [the client's] problems." *Nondirective*, Webster's Third New International Dictionary 1536 (2002); *see also* 84 Fed. Reg. at 7716 (nondirective counseling involves "clients tak[ing] an active role in processing their experiences and identifying the direction of the interaction"). Because

HHS's interpretation of "nondirective" is reasonable, we defer to that interpretation. *See Chevron*, 467 U.S. at 843–44; *Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008).

We also reject plaintiffs' and the dissent's argument that the Final Rule is directive because it requires referrals for medically necessary prenatal health care. Dissent at 85. HHS could reasonably conclude that referrals for prenatal care are nondirective, as HHS defines this term, because a referral for prenatal care does not steer the client toward any particular option and does not discourage a client from seeking an abortion outside of the Title X program. As HHS points out, "seeking prenatal care is not the same as choosing the option of childbirth." 84 Fed. Reg. at 7748. Further, HHS could reasonably conclude that providing a referral for prenatal care is not directive because it is "medically necessary" for the health of the client during pregnancy, *id.* at 7748, 7761–62, regardless of whether the client later chooses an abortion outside of a Title X project.[19] "Where care is medically

---

[19] Plaintiffs and the dissent point to declarations from doctors and nurse practitioners conclusorily stating that prenatal care "is *not* medically necessary for someone who wishes to terminate her pregnancy." Dissent at 88 n.5. But HHS reasonably concluded otherwise, 84 Fed. Reg. at 7748, 7761–62, based on its determination that "pregnancy may stress and affect extant [i.e., existing] health conditions [of the client]," such that "primary health care may be critical to ensure that pregnancy does not negatively impact such conditions," *id.* at 7750.

The dissent's argument that HHS did not justify the referral requirement on the ground that prenatal care is medically necessary for the health of the client, Dissent at 88 n.5, is refuted by the record; indeed, the sentence of the Final Rule on which the dissent relies for this argument makes clear that prenatal care is "important for . . . *the health of the women*," 84 Fed. Reg. at 7722 (emphasis added); *see also id.* at 7748,

necessary, as prenatal care is for pregnancy, referral for that care is not directive because the need for the care preexists the direction of the counselor, and is, instead, the result of the woman's pregnancy diagnosis or the diagnosis of a health condition for which treatment is warranted." *Id.* at 7748. Because prenatal care is medically necessary for a pregnant client, *see id.* at 7748, 7761–62, referrals for such care are distinguishable from referrals for abortions for the purpose of family planning, which are not medically necessary. Indeed, the Supreme Court has long recognized that abortion need not be treated the same as other medical procedures: "Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life." *Harris v. McRae*, 448 U.S. 297, 325 (1980); *see also Maher*, 432 U.S. at 480 ("The simple answer to the argument" that a law imposes different requirements on abortion than other medical procedures is that other "procedures do not involve the termination of a potential human life.").[20] Given these distinctions, requiring

_____

7761–62.

[20] Given the "inherent[] differen[ces]" between abortion and other medical procedures, *McRae*, 448 U.S. at 325, the dissent's attempt to liken nontherapeutic abortion to treatment options for prostate cancer is meritless, Dissent at 87. Prostate cancer is a disease, and "chemotherapy, radiation, [and] hospice" are treatment options. Dissent at 87. Pregnancy is not a disease, and a nontherapeutic abortion is not a treatment option.

By contrast, abortion is *not* used as a "method of family planning" under § 1008 or the Final Rule when abortion is medically necessary (i.e., therapeutic). *See Abortion, elective*, The American Medical Association Encyclopedia of Medicine 57 (1989) (defining a "therapeutic abortion" as an abortion "carried out to save the life or health of the mother"). Referrals for and counseling on therapeutic abortions are not subject to the same restrictions as those imposed on nontherapeutic ones; rather, in

referrals for medically necessary prenatal health care but not for nontherapeutic abortions does not make pregnancy counseling directive.[21]

---

situations where "emergency care is required," the Final Rule *requires* that clients be referred "immediately to an appropriate provider of medical services needed to address the emergency." 42 C.F.R. § 59.14(b)(2); *see also id.* § 59.14(e)(2) (requiring referral for emergency medical care upon the discovery of an ectopic pregnancy).

[21] The dissent's argument that clients who receive counseling on prenatal care and abortion (but not referrals for abortion providers) are "coerced," "demeaned," and prevented from taking "an active role in identifying the direction" of their lives is absurd. Dissent at 88 (cleaned up). Nothing in the Final Rule prevents clients from procuring abortions. *See* 42 C.F.R. § 59.14. Similarly, the dissent's reliance on the 2000 Rule to argue that failing to provide abortion referrals is coercive, Dissent at 88 n.5, is misplaced because the 2000 Rule merely suggested that a referral for "prenatal care *and delivery*" might be coercive if the client has rejected that option, 65 Fed. Reg. at 41,275 (emphasis added); the 2000 Rule said nothing about whether it is coercive to require a referral for prenatal care to safeguard the health of the client, *see* 84 Fed. Reg. at 7722.

The dissent's suggestion that clients relying on Title X services cannot locate abortion providers without a referral from a Title X counselor, Dissent at 89 n.6, is contrary to the reality—recognized in the Final Rule—that "[i]nformation about abortion and abortion providers is widely available and easily accessible, including on the internet," 84 Fed. Reg. at 7746. We decline to second-guess HHS's determination based on plaintiffs' unsupported declarations. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019); *cf.* Dissent at 89 n.6. In any event, Title X was not designed to be a source of assistance for procuring abortions, *cf.* Dissent at 87–89; rather, Congress's purpose in enacting Title X was to "fund and, thereby, encourage preconception services, a focus that "generally excludes payment for postconception care and services," including abortion. 84 Fed. Reg. at 7723. Congress's restriction on Title X projects leaves clients with "at least the same range of choice in deciding whether to obtain" an abortion as they would have had if Congress provided no Title X funding. *Harris*, 448 U.S. at 317. As *Rust*

Nor is the Final Rule directive because it allows referrals for adoption.  *See* 42 C.F.R. § 59.5(a)(1).  The Infant Adoption Awareness section, 42 U.S.C. § 254c-6(a)(1), does not require Title X projects to urge or encourage adoptions; rather, it provides funds for training staff of eligible health centers (which may include Title X projects) to provide adoption information and referrals on an equal basis with other courses of action included in nondirective counseling. Based on this legislation, HHS reasonably concluded that referrals for adoption are "appropriate under Title X, since Congress specified that Title X clinics and providers were eligible health centers to whom adoption related training should be offered," 84 Fed. Reg. at 7730.  Further, the language of the Infant Adoption Awareness section suggests that Congress did not interpret the phrase "nondirective counseling" as necessarily requiring a presentation of all options on an equal basis.  To the contrary, if Congress had defined "nondirective counseling" to require the presentation of all options on an equal basis, it would have been unnecessary to encourage health center staff to present information about adoption "on an equal basis with all other courses of action" as part of nondirective counseling, because the staff would have already been required to do so. 42 U.S.C. § 254c-6(a)(1).

---

recognized, "a doctor's ability to provide, and a woman's right to receive, abortion-related information remains unfettered outside the context of the Title X project."  500 U.S. at 203.  That some Title X clients "may be effectively precluded by indigency" or other circumstances from procuring "abortion-related services" is a product of those circumstances, "not of governmental restrictions."  *Id.*; *cf.* Dissent at 89 n.6.  Thus, the dissent, and the amici on which it relies, mistakenly fault the Final Rule for not helping clients "access[] abortion."  Dissent at 87–89.

Finally, the Final Rule's restrictions on referral lists do not render pregnancy counseling directive because a referral list does not present information in a way that encourages or promotes a specific option—it is merely "[a] list of licensed, qualified, comprehensive primary health care providers." 42 C.F.R. § 59.14(b)(1)(ii).  As *Rust* recognized, doctors are "free to make clear that advice regarding abortion is simply beyond the scope of the program."  500 U.S. at 200.[22]

Because HHS has reasonably interpreted the phrase "pregnancy counseling" as not including referrals, and has interpreted the word "nondirective" to mean a neutral presentation of options as opposed to the presentation of all possible options, we reject plaintiffs' argument that the term "nondirective pregnancy counseling" requires the provision of referrals for abortion on the same basis as referrals for prenatal care and adoption.  Accordingly, the challenged provisions of the Final Rule do not violate the 1996 appropriations rider.

---

[22] Plaintiffs briefly argue that the Final Rule's general prohibition on promoting or providing support for abortion as a method of family planning, *see* 42 C.F.R. § 59.14(a), may "chill discussions of abortion and thus inhibit[] neutral and unbiased counseling."  We reject this argument. If a provider promoted or supported abortion as a method of family planning, the counseling would be directive and therefore violate the appropriations rider.  *See* 84 Fed. Reg. at 7747.  By contrast, the Final Rule's prohibition on promoting or supporting abortion as a method of family planning both reinforces the rider's nondirective-counseling requirement and implements § 1008's prohibition on using Title X funds in programs "where abortion is a method of family planning."  § 1008, 42 U.S.C. § 300a-6.

B

Plaintiffs next argue that the Final Rule is inconsistent with § 1554 of the ACA. *See* § 1554, 124 Stat. at 259 (codified at 42 U.S.C. § 18114). In March 2010, Congress passed the ACA "to expand coverage in the individual health insurance market," *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015), and to decrease the cost of health care, *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). The ACA adopted "a series of interlocking reforms" primarily involving insurance reform, including barring insurers from considering an individual's health when deciding whether to offer coverage, requiring individuals to maintain health insurance coverage or face a penalty, and offering certain tax credits to make health insurance more affordable. *King*, 135 S. Ct. at 2485.

While Title I of the ACA focuses on health insurance issues, Subtitle G of that title, entitled "Miscellaneous Provisions," does not address insurance directly. Instead, it sets forth a series of measures aimed at protecting the interests of entities and individuals that might be affected by the ACA's sweeping program. Among other things, it requires HHS to promote transparency by providing a "list of all of the authorities provided to the Secretary under th[e] Act." 42 U.S.C. § 18112. It also precludes discrimination against health care providers for failing to offer assisted suicide, *see id.* § 18113, ensures that individuals and entities have the freedom not to participate in federal health insurance programs, *see id.* § 18115, and prohibits health care programs and employers from engaging in various discriminatory acts, *see id.* § 18116. Section 1554, part of Subtitle G's "Miscellaneous Provisions," is titled "Access to therapies" and provides:

Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—

> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;

> (2) impedes timely access to health care services;

> (3) interferes with communications regarding a full range of treatment options between the patient and the provider;

> (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;

> (5) violates the principles of informed consent and the ethical standards of health care professionals; or

> (6) limits the availability of health care treatment for the full durations of a patient's medical needs.

§ 1554, 124 Stat. at 259; 42 U.S.C. § 18114.

Plaintiffs and the dissent contend that three provisions of the Final Rule conflict with this provision of the ACA: the Final Rule's restrictions on promoting or supporting abortion

as a method of family planning and making referrals for abortion; its physical and financial separation requirement; and its requirement that providers encourage family participation in family planning decisions.   Dissent at 92–93.[23]

We disagree.   The Supreme Court has long made a distinction between regulations that impose burdens on health care providers and their clients and those that merely reflect Congress's choice not to subsidize certain activities.   *See Rust*, 500 U.S. at 192; *cf. United States v. Am. Library Ass'n*, 539 U.S. 194, 211–12 (2003); *Regan v. Taxation With*

---

[23] The government argues that plaintiffs' ACA-based challenge is waived because § 1554 was not raised during the notice-and-comment period, and so HHS did not have an opportunity to provide analysis and reasoning regarding whether the Final Rule was consistent with § 1554 or to make any conforming changes to the Final Rule.  Plaintiffs contend that many comments used terminology similar to that used in § 1554, and the similarity in terminology was enough to give HHS notice that the Final Rule could violate § 1554.  For instance, plaintiffs claim that commenters' objections to the Final Rule on the grounds that it would "ban Title X providers from giving women full information about their health care options" gave HHS notice that the Final Rule would violate § 1554's ban on promulgating a regulation that "interferes with communications regarding a full range of treatment options." 42 U.S.C. § 18114(3).  The district courts agreed.  *See California*, 385 F. Supp. 3d at 994–95; *Oregon*, 389 F. Supp. 3d at 914; *Washington*, 376 F. Supp. 3d at 1130.  Because there is an obvious difference between arguing that a regulation violates best medical practices and arguing that a regulation violates a statute, we are doubtful that plaintiffs preserved their argument that the Final Rule violated § 1554.  *See Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (per curiam) (holding that a proponent must raise a "specific argument," as opposed to a "general legal issue" to preserve a legal argument for review) (citing *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1291 (D.C. Cir. 2004)).  Nevertheless, because the Final Rule does not conflict with § 1554, we need not address this question of waiver.

*Representation of Wash.*, 461 U.S. 540, 549–50 (1983). Under the Supreme Court's jurisprudence, a state's decision not to subsidize abortion on the same basis as other procedures does not impose a burden on women, even when indigence "may make it difficult and in some cases, perhaps, impossible for some women to have abortions," because the law "neither created nor in any way affected" her indigent status. *Maher*, 432 U.S. at 474; *see also Webster v. Reprod. Health Servs.*, 492 U.S. 490, 509–10 (1989) (holding that a state law prohibiting abortions in public hospitals was permissible because it "leaves a pregnant woman with the same choices as if the State had chosen not to operate any public hospitals at all"); *Harris*, 448 U.S. at 317 ("[T]he Hyde Amendment [prohibiting the use of federal funds to pay for abortion services except under specified circumstances] leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all.").

*Rust* applied this well-established principle to the Title X context, rejecting arguments that the 1988 Rule's limitations on counseling and referrals for abortion impermissibly burdened the doctor-patient relationship, interfered with a woman's right to make "an informed and voluntary choice by placing restrictions on the patient-doctor dialogue," and impeded a woman's access to abortion services. 500 U.S. at 202. The Court recognized "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* at 193 (quoting *Maher*, 432 U.S. at 475). A government restriction on funding certain activities "is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes

for which they were authorized." *Id.* at 196. Nor do restrictions on funding interfere with appropriate medical care. In the context of Title X funding, restrictive regulations "leave the [Title X] grantee unfettered" in the services it can perform outside of the Title X project, *id.*, because the regulations "govern solely the scope of the Title X project's activities" and "do not in any way restrict the activities of those persons acting as private individuals," *id.* at 198–99. Further, "the Title X program regulations do not significantly impinge upon the doctor-patient relationship" because the doctor and patient may "pursue abortion-related activities when they are not acting under the auspices of the Title X project," *id.* at 200, and "[a] doctor's ability to provide, and a woman's right to receive, information concerning abortion and abortion-related services outside the context of the Title X project remains unfettered," *id.* at 203. The Court distinguished the sorts of limitations imposed by the 1988 Rule from a regime "in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197 (emphasis omitted).[24]

*Rust*'s logic applies equally to statutory and constitutional claims. If, as the Supreme Court has concluded, a rule

---

[24] The Supreme Court has repeatedly reaffirmed *Rust*'s ruling that the government may constitutionally preclude recipients of federal funds from addressing specified subjects so long as the limitation does not interfere with a recipient's conduct outside the scope of the federally funded program. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (citing *Rust*, 500 U.S. at 195 n.4); *accord Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015).

implementing the government's policy decision to encourage childbirth rather than abortion does not burden or interfere with a client's health care at all, *see Harris*, 448 U.S. at 317, then it does not matter whether the client's heath care rights were created by the Constitution or a statute.

The same reasoning applies here and requires us to distinguish between § 1554's prohibition on direct interference with certain health care activities and the Final Rule's directives that ensure government funds are not spent for an unauthorized purpose. As in *Rust*, the Final Rule's restrictions on funding certain activities do not create unreasonable barriers, impede access to health services, restrict communications, or otherwise involve "denying a benefit to anyone." *Id.* at 196. Nor, as *Rust* explained, do they interfere with appropriate medical care or "significantly impinge upon the doctor-patient relationship." *Id.* at 200. Rather, the Final Rule leaves a grantee "unfettered in its other activities" because it governs solely the scope of the services funded by Title X grants, *id.* at 196, and doctors and their clients remain free to exchange abortion-related information outside the context of the Title X project, *id.* at 203.[25] Therefore, the Final Rule's measures to ensure that government funds are spent for the purposes for which they

---

[25] Plaintiffs and the *California* district court speculate (without any support in the record) that the Final Rule's referral-list restrictions will delay clients from locating abortion providers and thus leave them worse off. *See California*, 385 F. Supp. 3d at 998. This is merely another version of the argument that Congress cannot prohibit Title X projects from assisting clients seeking abortion referrals. But such an argument has been rejected by the Supreme Court. *See Rust,* 500 U.S. at 193–94 (recognizing that restrictions of this type are permissible to ensure that "the limits of [Title X] are observed" so that project grantees and their employees do not "engag[e] in activities outside of the project's scope").

were authorized does not violate § 1554's restrictions on direct regulation of certain aspects of care.

The ACA itself makes clear that § 1554 is meant to prevent direct government interference with health care, not to affect Title X funding decisions. The most natural reading of § 1554 is that Congress intended to ensure that HHS, in implementing the broad authority provided by the ACA, does not improperly impose regulatory burdens on doctors and patients. Indeed, by introducing § 1554 with language focusing on the ACA—that "[n]otwithstanding any other provision of this Act," HHS may not take certain steps, 42 U.S.C. § 18114—Congress showed its intent to ensure that certain interests of individuals and entities would be protected notwithstanding the broad scope of the ACA, and that such protections would supersede any other provision of the ACA "in the event of a clash." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (citations omitted).

By contrast, the ACA did not seek to alter the relationship between federally funded grant programs and abortion in a fundamental way. *See, e.g.*, Pub. L. No. 111-148, title X, § 10104(c)(2), 124 Stat. at 897 (codified at 42 U.S.C. § 18023(c)(2)). Section 10104(c)(2)(A) of the Act provides that "[n]othing in this Act shall be construed to have any effect on Federal laws regarding (i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii) discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion." 42 U.S.C. § 18023(c)(2)(A). An Executive Order issued shortly after the ACA was passed emphasized the ACA's neutrality regarding abortion issues, stating that "[u]nder the Act, longstanding Federal laws to protect conscience . . . remain

intact and new protections prohibit discrimination against
health care facilities and health care providers because of an
unwillingness to provide, pay for, provide coverage of, or
refer for abortions." Ensuring Enforcement and
Implementation of Abortion Restrictions in the Patient
Protection and Affordable Care Act, Exec. Order No. 13,535,
75 Fed. Reg. 15,599 (Mar. 24, 2010). Nor did the ACA
single out Title X for any changes. The ACA mentions
Title X only to clarify that Title X providers may qualify as
"teaching health centers" eligible for funds under a different
grant program. *See* Pub. L. No. 111-148, tit. V, § 5508,
124 Stat. at 669–70 (codified at 42 U.S.C. § 293*l*-1).

In short, the ACA did not address the implementation of
Congress's choice not to subsidize certain activities. The
Final Rule places no substantive barrier on individuals'
ability to obtain appropriate medical care or on doctors'
ability to communicate with clients or engage in activity
when not acting within a Title X project, and therefore the
Final Rule does not implicate § 1554.[26]

---

[26] The plaintiffs raise several other arguments that the Final Rule
violates Title X, but they do not merit much discussion. First, Washington
argues that the Final Rule violates § 1008's requirement that "acceptance
by any individual of family planning services . . . shall be voluntary"
because the Final Rule requires doctors to provide referrals for prenatal
care regardless whether a client asks for abortion information. We
disagree. The Final Rule preserves the requirement that "[a]cceptance of
services must be solely on a voluntary basis," 42 C.F.R. § 59.5(a)(2), and
nothing in the Final Rule makes acceptance of family planning services a
"prerequisite to eligibility for or receipt of any other service or assistance
from, or to participation in, any other program." 42 U.S.C. § 300a-5.

Second, some plaintiffs argue, and the *Washington* district court held,
376 F. Supp. 3d at 1130, that the central purpose of Title X is "to equalize
access to comprehensive, evidence-based, and voluntary family planning"

In sum, the Final Rule is not contrary to the appropriations rider, § 1554 of the ACA, or Title X. Plaintiffs' claims based on these provisions will not succeed. Accordingly, plaintiffs have not demonstrated likelihood of success on the merits based on these grounds. *See Winter*, 555 U.S. at 20.

## IV

We now turn to plaintiffs' arguments that the Final Rule is arbitrary and capricious under the APA.[27]   The APA requires a reviewing court to "hold unlawful and set aside

and that the Final Rule is inconsistent with this purpose.  We disagree. The Supreme Court determined that provisions substantially identical with those in the Final Rule were consistent with Title X.  *Rust*, 500 U.S. at 178–79.

Finally, Washington argues in passing that 42 C.F.R. § 59.18 is invalid because it allows Title X funds to be used "to offer family planing methods and services" but not "to build infrastructure for *purposes prohibited with these funds*, such as support for the abortion business of a Title X grantee or subrecipient." 42 C.F.R. § 59.18(a) (emphasis added). According to Washington, this provision "limits the use of Title X funds for core functions" and therefore violates a provision of Title X authorizing the use of funds "to assist in the establishment and operation of voluntary family planning projects," § 1001; 42 U.S.C. § 300.  This argument is meritless, because § 59.18 merely harmonizes § 1001 with § 1008's prohibition on the use of Title X funds "in programs where abortion is a method of family planning."  § 1008; 42 U.S.C. § 300a-6.

[27] While the district court in *Oregon* found only "serious questions going to the merits of [the] claims that the Final Rule is arbitrary and capricious," 389 F. Supp. 3d at 903, the *California* district court went further and concluded that the promulgation of the Final Rule was, in fact, arbitrary and capricious, 385 F. Supp. 3d at 1000.  Rather than review these determinations separately, we consolidate our analysis given that the Final Rule is not arbitrary and capricious as a matter of law.

agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). Our review under this directive is narrow and deferential. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019). We "must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016) (cleaned up). "Th[is] requirement is satisfied when the agency's explanation is clear enough that its path may reasonably be discerned," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (internal quotation marks omitted), even where an agency's decision is "of less than ideal clarity," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

We defer to the agency's expertise in interpreting the record and to "the agency's predictive judgment" on relevant questions. *Id.* at 521; *see also Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009). "It is well established that an agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, so long as they are reasonable." *BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008) (quoting *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 260 (D.C. Cir. 2007)). Agency predictions of how regulated parties will respond to its regulations do not require "complete factual support in the record" and "necessarily involve[] deductions based on the expert knowledge of the agency." *FCC v. Nat'l Citizens*

*Comm. for Broad.*, 436 U.S. 775, 814 (1978) (internal quotation marks omitted).**[28]**

We also defer to the agency's expertise in identifying the appropriate course of action. With respect to the agency's final decision, we cannot "ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782. Nor may we "substitute our judgment for that of the [agency]." *Dep't of Commerce*, 139 S. Ct. at 2569. We are also prohibited from "second-guessing the [agency]'s weighing of risks and benefits and penalizing [it] for departing from the . . . inferences and assumptions" of others. *Id.* at 2571.

Nor do we give heightened review to agency action that "changes prior policy." *Fox*, 556 U.S. at 514. The APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action." *Id.* at 514–15. Initial agency determinations are "not instantly carved in stone." *Chevron*, 467 U.S. at 863. Of course, the "requirement that an agency provide reasoned explanation for its action would ordinarily demand that [the agency] display awareness that it *is* changing position" and "that there are good reasons for the new policy." *Fox*, 556 U.S. at 515. For example, an agency may not "depart from a prior policy *sub*

---

**[28]** The district courts relied on the predictions and opinions of experts provided by plaintiffs. *See, e.g.*, *California*, 385 F. Supp. 3d at 1015–19; *Oregon*, 389 F. Supp. 3d at 918; *Washington*, 376 F. Supp. 3d at 1131. But it is not our job to weigh evidence or pick the more persuasive opinions and predictions. Rather, the agency has discretion to rely on its own expertise "even if, as an original matter, a court might find contrary views more persuasive." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (internal quotations marks omitted).

*silentio* or simply disregard rules that are still on the books." *Id.* Likewise, "[i]t would be arbitrary or capricious to ignore," where applicable, that "its new policy rests upon factual findings that contradict those which underlay its prior policy," or that "its prior policy has engendered serious reliance interests that must be taken into account." *Id.* But under our narrow review, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* In sum, we "must confine ourselves to ensuring that [the agency] remained within the bounds of reasoned decisionmaking." *Dep't of Commerce*, 139 S. Ct. at 2569 (internal quotation marks omitted).

Plaintiffs argue that several aspects of the Final Rule are arbitrary and capricious: (1) the physical and financial separation requirement; (2) HHS's overall cost-benefit analysis; (3) the counseling and referral restrictions; (4) the requirement that pregnancy counseling be provided only by medical doctors or advanced practice providers; and (5) the requirement that family planning options be "acceptable and effective," rather than also "medically approved." We consider these arguments in turn.

## A

Plaintiffs first argue that HHS's promulgation of the physical and financial separation requirement in 42 C.F.R. § 59.15 was arbitrary and capricious because HHS failed to substantiate an adequate need for the requirement and ignored the predictions of some commenters that the requirement

would have a significant adverse impact on the Title X network and client health.

We disagree.  HHS examined the relevant considerations and provided a reasoned analysis for adopting this provision. *See Elec. Power Supply Ass'n*, 136 S. Ct. at 782.  It stated its primary reason for reestablishing the requirement was that physical separation would more effectively implement § 1008.  84 Fed. Reg. at 7764.  While the financial separation required by the 2000 Rule was a necessary component of § 1008's implementation, HHS explained, physical separation was equally required given Congress's mandate that Title X funds not support programs in any location "'*where*' abortion is offered as a method of family planning."  *Id.* at 7765 (emphasis added).  HHS also expressly adopted the 1988 Rule's rationale for physical and financial separation upheld in *Rust*, *id.*, and gave ample additional reasons supporting this conclusion.

First, HHS pointed to the public confusion caused when physical separation was lacking.  *Id.*  According to HHS, the performance of abortion services and Title X-funded services in the same location engendered confusion and rendered it "often difficult for patients, or the public, to know when or where Title X services end and non-Title X services involving abortion begin."  *Id.* at 7764.  This confusion was evidenced by comments HHS had received on the Final Rule; according to HHS, many commenters seemed wholly unaware of the fact that Title X explicitly excludes funding for projects where abortion is a method of family planning. *Id.* at 7729.  HHS could reasonably conclude that the physical separation requirements could help minimize the appearance that the government is funding abortion as a method of family planning. *See* Brief of Amici Curiae Ohio and 12 Other States

in Support of Defendants-Appellants and Reversal at 16–19, *California v. Azar*, Nos. 19-15974 & 19-15979 (9th Cir. June 7, 2019) (emphasizing the importance to many citizens of putting "a greater distance between public funding and abortion-performing entities," and noting that at least 18 states have enacted laws designed to avoid even the appearance that state healthcare funds are being used to support entities involved in abortion services).

Second, HHS concluded that performing all services in the same facility "create[s] a risk of the intentional or unintentional use of Title X funds for impermissible purposes, the co-mingling of Title X funds, . . . and the use of Title X funds to develop infrastructure that is used for the abortion activities of Title X clinics." 84 Fed. Reg. at 7764. This risk is not speculative. As HHS explained, economies of scale and shared overhead achieved through collocation of a Title X clinic and an abortion-providing clinic effectively support the provision of abortion. *See id.* at 7766. HHS relied in part on recent studies that show abortions are increasingly being performed at facilities that had historically focused on providing contraceptive and family planning services (the typical profile of facilities that receive Title X funds), which supports the inference that a growing number of Title X recipients may perform abortions at facilities that also offer Title X-funded services. *Id.* at 7765.

In reaching its conclusion, HHS responded to commenters' concerns in detail. HHS first noted the concern that requiring physical and financial separation "would increase the cost for doing business." *Id.* at 7766. HHS explained that such comments confirmed its concern that Title X funds were directly or indirectly supporting abortion as a method of family planning. *Id.* "Money is fungible,"

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010), and HHS reasonably concluded that "flexibility in the use of Title X funds under the 2000 [Rule]" allowed grantees to use Title X funds to "build infrastructure that can be used for [prohibited] purposes . . . such as support for the abortion business of a Title X grantee," 84 Fed. Reg. at 7773, 7774.

Next, with respect to those Title X projects that would need to make changes to comply with the separation requirements, HHS predicted that the costs of compliance would not be as significant as some commenters predicted. *Id.* at 7781 (noting such commenters "did not provide sufficient data to estimate these [predicted] effects across the Title X program"). HHS discounted the predictions, which relied on "assumptions that [providers] would have to build new facilities in order to comply with the requirements." *Id.* Rather, HHS predicted that most entities would likely choose lower cost methods of compliance. *Id.* For example, "Title X providers which operate multiple physically separated facilities and perform abortions may shift their abortion services, and potentially other services not financed by Title X, to distinct facilities, a change which likely entails only minor costs." *Id.* HHS explained that the Final Rule permitted "case-by-case determinations on whether physical separation is sufficiently achieved to take the unique circumstances of each program into consideration," and that "[p]roject officers are available to help grantees successfully implement the Title X program" and to come up with "a workable plan" for compliance. *Id.* at 7766.

Finally, HHS addressed the "contention of some commenters that the physical and financial separation requirements will destabilize the network of Title X providers," upset the reliance interests of providers who have

incurred costs relying on HHS's previous regulations, and "exacerbate health inequalities or harm patient care." *Id.* HHS disagreed with the commenters' predictions that the separation requirements would result in a significant departure of Title X providers from the program, explaining that the Final Rule "continues to allow organizations to receive Title X funds even if they also provide abortion as a method of family planning, as long as they comply with" the separation requirements. *Id.* HHS further noted that a Congressional Research Service report estimated that only 10 percent of clinics that receive Title X funding offer abortion as a method of family planning. *Id.* at 7781. And while some Title X providers "may share resources with unaffiliated entities that offer abortion as a method of family planning," HHS estimated that only around 20 percent of all Title X service sites had "their Title X services and abortion services . . . currently collocated" such that they would be materially impacted by the separation requirements. *Id.* Accordingly, HHS concluded that the separation requirements would have only "minimal effect on the majority of current Title X providers." *Id.*

At the same time, HHS predicted that providers who were willing to comply with the new requirements would expand their services and that other provisions of the Final Rule would encourage new "individuals and institutions to participate in the Title X program." *Id.* at 7766. For example, HHS expected "that honoring statutory protections of conscience in Title X may increase the number of providers in the program," because providers or entities would now "know they will be protected from discrimination on the basis of conscience with respect to counseling on, or referring for, abortion." *Id.* at 7780. HHS cited a poll by the Christian Medical Association showing that faith-based

medical professionals would limit the scope of their practice without conscience protections; HHS reasoned the Final Rule's prohibition on abortion referral and removal of the 2000 Rule's abortion counseling requirement would allow such professionals to enter the Title X program. *Id.* at 7780 n.138.[29] And while HHS acknowledged that it "cannot calculate or anticipate future turnover in grantees," under HHS's "best estimates," it did "not anticipate that there will be a decrease in the overall number of facilities offering services, since it anticipates other, new entities will apply for funds, or seek to participate as subrecipients, as a result of the final rule." *Id.* at 7782.[30]

Plaintiffs, in effect, argue that HHS's determination was arbitrary and capricious because the agency relied on its own predictions and rejected those submitted by commenters opposing the Final Rule. We reject this argument because

---

[29] HHS's inferences regarding the data's implication for Title X applications is within HHS's core area of expertise and therefore entitled to deference. *See Trout Unlimited*, 559 F.3d at 959; *BNSF Ry. Co.*, 526 F.3d at 781. The dissent's de novo evaluation of the study is not entitled to such deference. *See* Dissent at 103–104.

[30] In supporting its argument that HHS's cost-benefit analysis is arbitrary and capricious, the dissent looks outside the record to argue that some grantees, such as Planned Parenthood, have voluntarily terminated their participation in Title X. *See* Dissent at 101 & n.15. Of course, such post hoc, extra-record evidence cannot be a basis for determining whether HHS's promulgation of the Final Rule was arbitrary and capricious. In any event, the dissent's extra-record observation is misleading: HHS has issued supplemental grant awards to other Title X recipients that, in HHS's estimation, "will enable grantees to come close to—if not [in excess of]—prior Title X patient coverage," Press Release, Dep't Health & Human Servs., HHS Issues Supplemental Grant Awards to Title X Recipients (Sept. 30, 2019), https://www.hhs.gov/about/news/2019/09/30/hhs-issues-supplemental-grant-awards-to-title-x-recipients.html.

HHS's predictive judgments about the Final Rule's effect on the availability of Title X services are entitled to deference. *See Trout Unlimited*, 559 F.3d at 959. Here, the predictions concern matters squarely within HHS's "field of discretion and expertise." *BNSF Ry. Co.*, 526 F.3d at 781 (quoting *Wis. Pub. Power*, 493 F.3d at 260). As the agency tasked with implementing the grant program, HHS is in the best position to anticipate the behavior of grantees and prospective grantees. HHS reasonably considered the evidence before it, where "complete factual support" for any prediction was "not possible or required," *Nat'l Citizens Comm. for Broad.*, 436 U.S. at 814, such that its decision "remained 'within the bounds of reasoned decisionmaking,'" *Dep't of Commerce*, 139 S. Ct. at 2569 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)). Although the commenters opposing the Final Rule provided numerous expert declarations elaborating their gloomy assumptions about the future behavior and activities of current and future Title X grantees, at bottom such future-looking "pessimistic" predictions and assumptions are "simply evidence for the [agency] to consider," *Dep't of Commerce*, 139 S. Ct. at 2571, and are not entitled to controlling weight.[31] HHS

---

[31] *Department of Commerce* held that it was not arbitrary and capricious for the Secretary of Commerce to decline to rely on the conclusions of the "technocratic" experts in the Census Bureau. 139 S. Ct. at 2571. So too here: HHS may reasonably decide not to rely on the opinions of outside commenters, even where they claim expertise. The dissent insinuates that reliance on *Department of Commerce* is misplaced because "the Court *struck down* the Secretary of Commerce's attempt to reinstate the citizenship question on the census." Dissent at 101 n.15. But the Court "d[id] not hold that the agency decision . . . was substantively invalid"; it merely affirmed the district court's decision to remand to the agency due to a perceived "mismatch between the decision the Secretary made and the rationale provided." *Dep't of Commerce*, 139 S. Ct. at 2575–76. Here, there is no "disconnect between the decision [HHS] made

need not produce "some special justification for drawing [its] own inferences and adopting [its] own assumptions." *Id.* Although plaintiffs and the dissent have reached a different conclusion, we consider only whether the agency examined the relevant considerations and laid a reasonably discernable path.

In light of HHS's reasoned explanation of its decisions and its consideration of the comments raised, we reject plaintiffs' arguments that HHS failed to base its decision on evidence, failed to consider potential harms in its cost-benefit analysis, failed to explain its reasons for departing from the 2000 Rule's provisions, and failed to consider the reliance interest of providers who have incurred costs relying on HHS's previous regulation. The Final Rule's separation requirements are not arbitrary and capricious.

## B

Plaintiffs and the dissent make a similar argument that HHS's cost-benefit analysis of the Final Rule was arbitrary and capricious. Dissent at 100–106. They argue that HHS ignored the commenters who predicted the Final Rule would cause an exodus of Title X providers and have a deleterious effect on client care, and instead relied on its own predictions about the Final Rule's benefits.

Like plaintiffs' challenge to the physical and financial separation requirements, the challenge to HHS's cost-benefit analysis fails. HHS considered and addressed "the concern

---

and the explanation given," *id.* at 2575, so the grounds on which *Department of Commerce* ultimately affirmed the decision to remand are irrelevant.

expressed by some commenters regarding the effect of this rule on quality and accessibility of Title X services," and explained its reasons for relying on its own predictions regarding the likely behavior of current and future Title X grantees. 84 Fed. Reg. at 7780. HHS likewise rejected the "extremely high cost estimates" for compliance with the separation requirements, reasoning that providers would tend to seek out lower cost options, such as shifting abortion services to distinct facilities rather than constructing new ones. *Id.* at 7781–82.[32] HHS was not required to accept the commenters' "pessimistic" cost predictions, *Dep't of Commerce*, 139 S. Ct. at 2571, and the agency adequately explained why it did not expect grantees to participate in a mass rejection of Title X funds, *see* 84 Fed. Reg. at 7766. In

---

[32] The dissent asserts that HHS "calculated [the] costs of compliance with the physical separation requirement in a 'mystifying' way." Dissent at 102 n.16 (quoting *California*, 385 F. Supp. 3d at 1008). But there is nothing "mystifying" about HHS's cost estimates. HHS estimated that between 10 and 30 percent of all Title X projects would need to be evaluated to determine compliance with the physical separation requirements. 84 Fed. Reg. at 7781. It then predicted that such evaluations would determine that between 10 to 20 percent of the evaluated sites do not comply with the physical separation requirements. *Id.* "At each of these service sites, [HHS] estimates that an average of between $20,000 and $40,000, with a central estimate of $30,000, would be incurred to come into compliance with physical separation requirements in the first year following publication of a final rule in this rulemaking." *Id.* at 7781–82. HHS then added together the costs of conducting the evaluations and bringing non-compliant facilities into compliance, and concluded its estimates "would imply costs of $36.08 million in the first year following publication of a final rule." *Id.* at 7782. Based solely on statements made by plaintiffs' lawyers during oral argument, the dissent speculates that HHS's cost estimates were too optimistic. Dissent at 102 n.16. But we need not favor plaintiffs' pessimistic cost estimates over those provided by HHS. *See Dep't of Commerce*, 139 S. Ct. at 2571.

light of HHS's conclusion that an ample number of Title X projects would continue to provide family planning services, HHS reasonably concluded that the harms flowing from a gap in care would not develop. *See id.* at 7775, 7782. We give substantial deference to such predictive judgments within the scope of HHS's expertise. *Trout Unlimited*, 559 F.3d at 959. On this record, we will not second-guess HHS's consideration of the risks and benefits of its action. *See Dep't of Commerce*, 139 S. Ct. at 2571.

## C

Plaintiffs next assert that the referral restrictions are arbitrary and capricious. They first argue that HHS failed to justify the need for this provision adequately. We disagree. HHS stated it was reestablishing the 1988 Rule for referrals because it concluded that the 2000 Rule was inconsistent with § 1008. Under HHS's interpretation of § 1008, "in most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning." 84 Fed. Reg. at 7717. Further, HHS concluded that the 2000 Rule's requirement that Title X projects provide abortion referrals and nondirective counseling on abortion was inconsistent with federal conscience laws. *Id.* at 7716. HHS referenced its 2008 nondiscrimination regulations, which had reached the same conclusion. *Id.* (quoting 73 Fed. Reg. at 78,087). HHS also explained that eliminating the 2000 Rule's counseling and referral requirements would "reduce the regulatory burden [on HHS] associated with monitoring and regulating Title X providers for compliance," *id.* at 7719, "add clarity to extant conscience protections, [and make] it easier for entities to participate who may have felt unable to do so in the past," *id.* at 7778. In sum, HHS

engaged in "reasoned decisionmaking." *Dep't of Commerce*, 139 S. Ct. at 2569.**[33]**

Plaintiffs next argue that HHS did not justify the need for the counseling and referral restrictions because non-objecting health care staff could provide counseling and referrals for abortion without violating the federal conscience laws. Therefore, plaintiffs urge, HHS's reliance on federal conscience laws as justification was arbitrary and capricious. We reject this argument, because it amounts to little more than the claim that HHS should have adopted plaintiffs' preferred regulatory approach. But HHS acted well within its authority in deciding how best to avoid conflict with the federal conscience laws. We do not "ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782. Rather, we defer to the agency's reasoned conclusion.

Plaintiffs also argue that HHS failed to consider claims by some commenters that the restrictions would require "providers to violate their ethical obligations to stay in the program" because they require "providers to withhold information about abortion (including referral) that the patient needs," and to provide "a biased and misleading list of

---

**[33]** The plaintiffs' argument that the referral restrictions are arbitrary and capricious because they conflict with guidelines in the QFP is meritless, because these guidelines were based on the 2000 Rule, and are superseded by the Final Rule. *See* Dep't Health & Human Servs., *Announcement of Availability of Funds for Title X Family Planning Services Grants*, at 14–15 (2019).

primary health care providers."[34]   But HHS specifically
addressed those concerns.  It stated that the counseling and
referral restrictions would not result in ethical violations
because the Final Rule permitted providers to give
"nondirective pregnancy counseling to pregnant Title X
clients on the patient's pregnancy options, including
abortion."  84 Fed. Reg. at 7724.[35]   HHS reasoned that the

---

[34] The dissent repeatedly echoes the plaintiffs' claims that the Final
Rule contradicts or violates medical ethics because it limits Title X
projects from encouraging and supporting abortion and from referring
clients to abortion providers.  *See* Dissent at 92–93, 98–99 & n.13.
Despite the dissent's and plaintiffs' ethical claims, neither cites an opinion
from the AMA's *Code of Medical Ethics* directly addressing abortion.
*See, e.g.*, Dissent at 99 n.13.  Rather, the dissent and plaintiffs cite more
general guidance regarding a physician's obligation to inform the patient
regarding "treatment alternatives" for medical conditions; because a
nontherapeutic abortion is not a "treatment" option for a medical condition
but rather a procedure for terminating a healthy pregnancy, such guidance
does not directly relate to this issue.

It is not surprising that medical ethical rules are not as absolute as the
dissent claims; as noted in *Roe v. Wade*, the AMA's views of medical
ethics and abortion changed from a condemnation of the "unwarrantable
destruction of human life" to the conclusion that abortions could properly
be performed in some circumstances.  410 U.S. 113, 142 (1973).  Despite
greater public acceptance of abortion today, the issue raises controversial
ethical questions, as demonstrated by (among other things) the continued
enactment of federal conscience laws and public comments urging HHS
to protect physicians' ability to decline to counsel on or refer for abortion.
*See* 84 Fed. Reg. at 7746–47; *see also* Brief of Amici Curiae Ohio, *supra*
at 16 (many citizens "believe that permitting abortion providers or
advocates to participate in providing a government-funded service implies
a public imprimatur on abortion—an imprimatur that citizens legitimately
seek to withhold").

[35] The dissent argues that in reaching this conclusion, HHS
contradicted its prior conclusion in the 2000 Rule as to "what medical
ethics demand."  Dissent at 99.  But HHS did not provide an opinion on

Final Rule allows physicians "to discuss the risks and side effects of each option, [including abortion,] so long as this counsel in no way promotes or refers for abortion as a method of family planning." *Id.* A client may "ask questions and . . . have those questions answered by a medical professional." *Id.* HHS also noted that where care is medically necessary, referral for that care is required, notwithstanding the Final Rule's other requirements. *Id.* Consistent with *Rust*, HHS concluded that "it is not necessary for women's health that the federal government use the Title X program to fund abortion referrals, directive abortion counseling, or give to women who seek abortion the names of abortion providers." *Id.* at 7746.[36] These statements show HHS examined the relevant considerations arising from commenters citing medical ethics and rationally articulated an explanation for its conclusion. *See Elec. Power Supply Ass'n*, 136 S. Ct. at 782.

---

this issue when it overruled its prior 1988 Rule; it merely referenced the views of commenters, without adopting those views as its own. *See* 65 Fed. Reg. at 41,273. Thus, the dissent's argument that HHS "changed its position on what medical ethics demand" is meritless.

[36] *Rust* rejected ethical arguments similar to those raised here. *See* 500 U.S. at 213–14 (Blackmun, J. dissenting) (arguing that "the ethical responsibilities of the medical profession demand" that a physician be free to inform patients about abortion). According to the Court, "the Title X program regulations do not significantly impinge upon the doctor-patient relationship" because, among other reasons, "the doctor-patient relationship established by the Title X program [is not] sufficiently all encompassing so as to justify an expectation on the part of the patient of comprehensive medical advice," and "a doctor's silence with regard to abortion cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her," given that "[t]he program does not provide post conception medical care." *Id.* at 200. And under the Final Rule, as under the 1988 Rule, "[t]he doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program." *Id.*

Because HHS's decisionmaking path "may reasonably be discerned," *Dep't of Commerce*, 139 S. Ct. at 2578, we reject plaintiffs' claims that the counseling and referral restrictions are arbitrary and capricious.

## D

We next consider plaintiffs' claim that the Final Rule's requirement that all pregnancy counseling be provided by medical doctors or advanced practice providers is arbitrary and capricious. Plaintiffs argue that because HHS defined the term "advanced practice providers" too narrowly, and did not have a reasoned basis for drawing the line at which medical professionals may provide pregnancy counseling, the provision is arbitrary and capricious.

We disagree. HHS explained that, in its judgment, "medical professionals who receive at least a graduate level degree in the relevant medical field and maintain a federal or State-level certification and licensure to diagnose, treat, and counsel patients . . . are qualified, due to their advanced education, licensing, and certification to diagnose and treat patients while advancing medical education and clinical research." 84 Fed. Reg. at 7728.[37] We have no basis to conclude that this line-drawing determination, an inherently discretionary task, "is so implausible" that a difference with

---

[37] Although the dissent asserts that this requirement will "reduce the number of people who can provide pregnancy counseling and . . . require significant changes in Title X providers' staffing," Dissent at 102, HHS's definition covers a wide range of licensed medical professionals that HHS reasonably deemed qualified to provide health care advice, including physician assistants, certified nurse practitioners, clinical nurse specialists, certified registered nurse anesthetists, and certified nurse-midwifes, *see* 42 C.F.R. § 59.2.

plaintiffs' views "could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, we reject plaintiffs' arguments that HHS's technical determination of which medical professionals may provide pregnancy counseling is arbitrary and capricious.

E

Finally, we reject plaintiffs' argument that HHS was arbitrary and capricious in reestablishing the language of the 1988 Rule's requirement that all family planning methods and services be "acceptable and effective," instead of retaining the 2000 Rule's revision requiring that such methods and services also be "medically approved." 84 Fed. Reg. at 7732.

HHS adequately explained its reasons for reestablishing the 1988 Rule. HHS explained that the change was intended to "ensure that the regulatory language is consistent with the statutory language," *id.* at 7740, which requires Title X projects to "offer a broad range of acceptable and effective family planning methods and services," 42 U.S.C. § 300(a). HHS also explained that the meaning of "medically approved" was unclear. 84 Fed. Reg. at 7741. "For example, would approval by one medical doctor suffice, or would some larger number need to approve, and if so, how many; would certain medical organizations, or governmental organizations, or both, need to approve, and if so, which ones; would a certain level of medical consensus need to exist concerning a particular method or service, and if so, how would the Department measure that consensus; and when doctors and medical organizations disagree either about a family planning

method or service, how would that requirement apply?" *Id.*
at 7732.

HHS also explained its rejection of the comment
suggesting the phrase "medically approved" means "FDA
approved." HHS stated that "[s]ome family planning
methods cannot be medically approved by . . . the [FDA],
because they do not fall within its jurisdiction," and provided
examples, such as fertility-awareness based methods of
family planning. *Id.* at 7741 & n.69. In HHS's judgment,
"[t]his did not mean that such methods of family planning are
unacceptable or ineffective in the view of medical sources."
*Id.* at 7741. Accordingly, HHS determined that "[t]he
statutory language of 'acceptable and effective family
methods or services,' without the phrase 'medically
approved[,]' provides sufficient guidance to Title X projects
in considering the types of family planning methods and
services that they provide." *Id.*

HHS likewise sufficiently addressed comments that its
decision to omit the phrase "medically approved" would
promote political ideology over science, lead to negative
health consequences for clients, and undermine
recommendations from other agencies. *See id.* at 7740–41.
We defer to HHS's reasonable conclusion that Title X's
statutory requirement that family planning methods and
services must be "acceptable and effective" sufficiently
prohibits Title X projects from engaging in health fraud or
quackery. *Id.* at 7741.

Because HHS "examined the relevant considerations and
articulated a satisfactory explanation for its action," *Elec.
Power Supply Ass'n*, 136 S. Ct. at 782 (cleaned up), we reject

plaintiffs' argument that this change was arbitrary and capricious.

In sum, we hold that the Final Rule is not arbitrary and capricious.

\* \* \*

Because plaintiffs' claims will not succeed given our resolution of the underlying legal questions, we end our analysis here. *See Munaf*, 553 U.S. at 691; *Garcia*, 786 F.3d at 740. We hold that the Final Rule is a reasonable interpretation of § 1008, it does not conflict with the 1996 appropriations rider or other aspects of Title X, and its implementation of the limits on what Title X funds can support does not implicate the restrictions found in § 1554 of the ACA. Moreover, the Final Rule is not arbitrary and capricious because HHS properly examined the relevant considerations and gave reasonable explanations. *See Elec. Power Supply Ass'n*, 136 S. Ct. at 782. Plaintiffs will not prevail on the merits of their legal claims, so they are not entitled to the "extraordinary remedy" of a preliminary injunction. *See Winter*, 555 U.S. at 22. Accordingly, the district courts' preliminary injunction orders are vacated and the cases are remanded for further proceedings consistent with this opinion. The government's motion for a stay pending appeal is denied as moot.

**VACATED AND REMANDED.**[38]

---

[38] Costs on appeal shall be taxed against plaintiffs.

PAEZ, Circuit Judge, joined by THOMAS, Chief Judge, WARDLAW and FLETCHER, Circuit Judges, dissenting:

Millions of Americans depend on Title X for their health care, including lifesaving breast and cervical cancer screenings, HIV testing, and infertility and contraceptive services. Congress created the Title X program in 1970 to ensure that family planning services would be "readily available to all persons desiring such services," Pub. L. No. 91-572 § 2, 84 Stat. 1504 (1970), and entrusted the United States Department of Health and Human Services ("HHS") with the responsibility of disbursing Title X funds to health care providers serving low-income Americans.

Since then, Congress has twice circumscribed HHS's authority in administering the Title X program. First, Congress directed that the health care providers who receive Title X funds inform pregnant patients of their options without advocating one choice over another. Second, Congress barred HHS from promulgating regulations that burden patients' access to health care, interfere with communications between patients and their health care providers, or delay patients' access to care.

In 2019, HHS promulgated the regulations at issue in this litigation ("the Rule"). *See* Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714 (Mar. 4, 2019). Among other things, the Rule gags health care providers from fully counseling women about their options while pregnant and requires them to steer women toward childbirth (the "Gag Rule"). It also requires providers to physically and financially separate any abortion services they provide (through non-Title X funding sources) from all other

health care services they deliver (the "Separation Requirement").

Three separate district courts in well-reasoned opinions recognized that the Rule breaches Congress's limitations on the scope of HHS's authority and enjoined enforcement of the Rule.[1] In vacating the district courts' preliminary injunctions, the majority sanctions the agency's gross overreach and puts its own policy preferences before the law. Women[2] and their families will suffer for it. I strongly dissent.

\*\*\*

The majority would return us to an older world, one in which a government bureaucrat could restrict a medical professional from informing a patient of the full range of health care options available to her. Fortunately, Congress has ensured such federal intrusion is no longer the law of the land.

---

[1] *See Oregon v. Azar* (*Oregon*), 389 F. Supp. 3d 898 (D. Or. 2019); *State of California v. Azar* (*California*), 385 F. Supp. 3d 960 (N.D. Cal. 2019); *Washington v. Azar* (*Washington*), 376 F. Supp. 3d 1119 (E.D. Wash. 2019).

[2] While the Rule disproportionately impacts women, people of all genders rely on Title X services, can become pregnant, and will suffer the consequences of the Rule. *See, e.g.,* Cal. Code Regs., tit. 2, § 11035(g) (defining individuals eligible for pregnancy accommodation as including "transgender employee[s] who [are] disabled by pregnancy"); Jessica A. Clarke, *They Them, and Theirs*, 132 Harv. L. Rev. 894, 954 (2019) ("People of all gender identities can be pregnant[.]"); *see also* Juno Obedin-Maliver & Harvey J. Makadon, *Transgender Men and Pregnancy*, 9 Obstetric Med., 4, 5 (2016).

The majority heavily relies, mistakenly, on *Rust v. Sullivan* and *Harris v. McRae*, decisions that held the Constitution confers no affirmative entitlement to state subsidization of abortion. Maj. Op. 22–24, 50 n.21, 55–59; *Rust*, 500 U.S. 173, 201 (1991); *McRae*, 448 U.S. 297, 318 (1980); *see also Webster v. Reproductive Health Services*, 492 U.S. 490, 509 (1989); *Maher v. Roe*, 432 U.S. 464, 474 (1977). "Whether freedom of choice that is constitutionally protected warrants federal subsidization," the Court reasoned in *McRae*, "is a question for Congress to answer, not a matter of constitutional entitlement." 448 U.S. at 318. It is constitutionally permissible to "leave[] an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all." *Id.* at 317. In other words, Congress can choose to disburse its funds however it likes. I do not take issue with that principle.

The problem for the majority's position is that Congress has in fact chosen to disburse public funds differently since the days of *Rust*. Perhaps recognizing that medical ethics and gender norms have evolved, Congress in 1996 and again in 2010 enacted statutory protections that exceed the constitutional floor set decades ago. In 1996 (and every year since) Congress clarified that its decision not to subsidize abortion does not prohibit pregnancy counseling on the range of women's options; to the contrary, Congress explicitly required that "all pregnancy counseling shall be nondirective." Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ("the nondirective mandate"). And, in 2010, Congress prohibited HHS from promulgating regulations that

frustrate patients' ability to access health care. 42 U.S.C. § 18114.

The majority disregards twenty years of progress, insistent on hauling the paternalism of the past into the present. Because Congress has clarified the scope of HHS's authority, the *Rust* line of cases has little bearing on the matter before us. Our only task is to determine whether HHS has exceeded the authority Congress granted it. And as the district courts concluded, it has.

## I.  The Rule Violates Congress's Nondirective Mandate

Since 1996, Congress has provided a clear limitation on Title X funding, specifying "that all pregnancy counseling *shall be nondirective*." Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, and Continuing Appropriations Act, Pub. L. No. 115-245, 132 Stat. 2981, 3070–71 (2018) (emphasis added). The district courts separately determined that the Rule conflicts with Congress's nondirective mandate. 5 U.S.C. § 706(2)(A); *see Oregon*, 389 F. Supp. 3d at 909–13; *California*, 385 F. Supp. 3d at 986–92; *Washington*, 376 F. Supp. 3d at 1130. I agree.[3]

---

[3] We review for abuse of discretion the district courts' grant of the preliminary injunctions. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003). Because Plaintiffs' first two claims, namely whether the Rule violates Congress's nondirective mandate or the Affordable Care Act, turn on the merits of several legal issues, I agree with the majority that we may address the merits of those issues directly. The majority goes too far,

The Rule is nothing but directive. By its very terms, it requires a doctor to refer a pregnant patient for prenatal care, even if she does not want to continue the pregnancy, while gagging her doctor from referring her for abortion, even if she has requested specifically such a referral. 42 C.F.R. §§ 59.14(a), (b). The Rule does not stop there. If a doctor provides a patient a referral list of primary health care providers, no more than half of those providers may offer abortion services. 42 C.F.R. § 59.14(c)(2). And if the patient asks who on the list might actually provide her an abortion? The Rule muzzles her doctor from telling her. *Id.* The result is that patients are steered toward childbirth at every turn.

What can a doctor even say when confronted with her patient's questions about abortion? The Rule bars doctors from "promot[ing] . . . or support[ing] abortion as a method of family planning, []or tak[ing] any other affirmative action to assist a patient" in exercising her right to abortion. 42 C.F.R. § 59.14(a); *see also* 42 C.F.R. § 59.5(a)(5). Imagine a patient visits her Title X provider and asks whether she can get an abortion at the local hospital. Would it qualify as "promoting" abortion to answer the question? The Gag Rule makes doctors who desire to provide their patients with accurate information "walk on eggshells to avoid a potential transgression of the . . . Rule, whereas those describing the option of continuing the pregnancy face no comparable risk." *California*, 385 F. Supp. 3d at 992.

---

however, in adjudicating the merits of the third claim, namely whether the promulgation of the Rule was arbitrary and capricious, for the reasons discussed in Section III, *infra*.

The result is Kafkaesque.  *Oregon*, 389 F. Supp. 3d at 912.  As Judge McShane of the District of Oregon observed:

> The Gag Rule is remarkable in striving to make professional health care providers deaf and dumb when counseling a client who wishes to have a legal abortion or is even considering the possibility.  The rule handcuffs providers by restricting their responses in such situations to providing their patient with a list of primary care physicians who can assist with their pregnancy without identifying the ones who might perform an abortion.  Again, the response is required to be, "I can't help you with that or discuss it.  Here is a list of doctors who can assist you with your pre-natal care despite the fact that you are not seeking such care.  Some of the providers on this list—but in no case more than half—may provide abortion services, but I can't tell you which ones might.  Have a nice day."  This is madness.

*Id.* at 913 (footnote omitted).

The majority purports to see no problem here.  Although HHS itself defines "nondirective counseling" as "the meaningful presentation of options where the [medical professional] is 'not suggesting or advising one option over another,'" 84 Fed. Reg. at 7716 (citation omitted), the majority insists such counseling does not require the meaningful presentation of "all" options.  Maj. Op. 47.  Rather, in the majority's tortured telling, "nondirective"

requires only the "neutral" presentation of *some* options.[4] Maj. Op. 47.

Excluding an entire category of options is neither meaningful nor neutral. If a man were diagnosed with prostate cancer, and his doctor concluded that chemotherapy, radiation, or hospice were equally viable responses, each with different consequences for his quality of life, he would be upset, to say the least, to discover that he had been referred only for hospice care. Such a sham "presentation" of options would in no sense be nondirective.

So too here. Indeed, HHS itself has recognized that there can be no meaningful choice when a whole category of

---

[4] The majority sanctions HHS's post hoc interpretation that "counseling" does not include "referrals." Maj. Op. 41–46. Judge Chen of the Northern District of California readily dismissed this argument. *California*, 385 F. Supp. 3d at 988–91. As Judge Chen explained, nondirective counseling encompasses referrals for three reasons. First, Congress expressly stated so, a point HHS recognized when it promulgated the Rule. *See* 42 U.S.C. § 254c-6(a)(1) (requiring HHS to make training grants on "providing adoption information *and referrals* to pregnant women on an equal basis with all other courses of action *included in* nondirective counseling to pregnant women") (emphasis added); 84 Fed. Reg. at 7733 ("Congress has expressed its intent that postconception adoption information and *referrals be included as part of any nondirective counseling* in Title X projects when it passed . . . 42 U.S.C. 254c-6[.]") (emphasis added). Second, HHS itself describes referrals as part of counseling throughout the Rule and has done so across administrations. *See, e.g.,* 84 Fed. Reg. at 7730, 7733–34; U.S. Dep't Health & Human Services, *Program Guidelines for Project Grants for Family Planning Services* § 8.2 (1981) ("Post-examination counseling should be provided to assure that the client . . . receives appropriate referral for additional services as needed."). Third, industry understanding recognizes that counseling includes referrals. *See California*, 385 F. Supp. 3d at 989.

options is hidden from a patient: "In nondirective counseling, abortion must not be the only option presented by [medical professionals]; otherwise the counseling would violate . . . the Congressional directive that all pregnancy counseling be nondirective[.]" 84 Fed. Reg. at 7747. The Gag Rule does exactly that. For all pregnancy counseling not involving abortion, women can take an "active" and "informed" role in their pregnancy and family planning process; but once a woman asks for abortion information, she can no longer be provided all the information she seeks about her own medical care. *See* 84 Fed. Reg. at 7716–17. "[E]mpower[ed]" so long as she does what the agency and the majority want; "coerc[ed]" and demeaned if she tries to "take an active role in . . . identifying the direction" of her life's course. 84 Fed. Reg. at 7716; 65 Fed. Reg. at 41275.[5] The consequences will

---

[5] Indeed, in 2000, the agency concluded that "requiring a referral for prenatal care and delivery or adoption where the client rejected those options would seem *coercive* and inconsistent with the concerns underlying the 'nondirective' counseling requirement." 65 Fed. Reg. at 41275 (emphasis added).

The majority attempts to salvage the prenatal care referral requirement by claiming that prenatal care is medically necessary for *all* patients' health, regardless of their intent to end a pregnancy. Maj. Op. 48 & n.19. That's not true, as the American College of Obstetricians and Gynecologists ("ACOG") and other professional medical associations, as well as numerous physicians and other health care providers have attested. *See, e.g.,* Br. of Amici Curiae Am. Coll. of Obstetricians & Gynecologists, et al., at 14–15 ("Prenatal care is not medically indicated when a pregnant patient plans to terminate her pregnancy—it is recommended only when a patient plans to continue her pregnancy."); Decl. of J. Elisabeth Kruse, Nat'l Family Planning & Reprod. Health Ass'n Supplemental Excerpts of Record ("SER") at 256 (*Washington*) ("[O]f course, such care is *not* medically necessary for someone who wishes to terminate her pregnancy."); Decl. of Dr. Melissa Marshall, California SER 579 (*California*) ("[P]renatal health care is not medically necessary when a

STATE OF CALIFORNIA V. AZAR          89

be profound, delaying some women's access to time-sensitive care and preventing others from accessing abortion altogether.[6]

---

patient is terminating her pregnancy."); Decl. of Dr. Judy Zerzan-Thul, Washington SER 161 (*Washington*) ("[I]f a patient determined to be pregnant elects to terminate the pregnancy, pre-natal care would not be medically necessary."). And, regardless, that's not how HHS justified the requirement. Rather, HHS required the prenatal care referral because "such care is important" not only for women's health but also "for healthy *pregnancy and birth*." 84 Fed. Reg. at 7722 (emphasis added).

[6] As health care providers and amici make clear, the notion that "information about abortion is readily available 'on the internet' betrays a complete lack of understanding of the realities of our Title X patient population" who, "because of language, literacy (including health literacy and electronic literacy), or economic barriers[,]" depend on referrals from Title X providers in order to access care. Kruse, Nat'l Family Planning & Reprod. Health Ass'n SER 262 (*Washington*); *see also* Decl. of Dr. Sarah Prager, *id.* at 298–99 ("Because many Title X patients have linguistic, educational, informational, and financial barriers to accessing healthcare, the impediments introduced by the New Rule may prevent such patients from accessing abortion altogether."); Decl. of Dr. Blair Darney, Oregon SER 41 (*Oregon*) ("Researchers have studied the reasons women delay entry to care for abortion; logistics such as knowing where to go is among the reasons."); *cf.* Maj. Op. 50 n.21.

The barriers created by the Gag Rule are particularly substantial for young people, LGBTQ people, those with limited English proficiency, and patients in rural areas. *See, e.g.,* Br. of Amici Curiae Nat'l Ctr. for Youth Law, et al., at 16–17 ("Adolescents without easy access to transportation, a phone, and the Internet might be unable to research the providers on the list they are given. They also might not immediately comprehend that a medical professional, whom they trust, has referred them for care that they do not need or want . . . . Particularly for adolescents who are homeless or in foster care, navigating a maze of providers that might or might not offer abortion services could prove impossible."); Br. of Amici Curiae Nat'l Ctr. for Lesbian Rights, et al., at 13; Decl. of Kathryn Kost, California SER 156 (*California*). As one health care provider concluded, "The New

Congress has prohibited such a result. Contrary to the majority's contention that HHS is owed *Chevron* deference because Congress has not clarified the meaning of the term "nondirective", Maj. Op. 46, Congress has in fact done so. And where Congress's intent is clear, we "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

Congress has used "nondirective counseling" in only two instances: the annual HHS Appropriations Act at issue here and section 254c-6(a)(1) of the Public Health Service Act ("PHSA"). The latter provides that HHS shall make training grants "providing adoption information and referrals to pregnant women *on an equal basis with all other courses of action included in nondirective counseling* to pregnant women." 42 U.S.C. § 254c-6(a)(1) (emphasis added).

In response, the majority asserts that because § 254c-6(a)(1) is not part of Title X and was enacted for a different purpose, "it sheds no light on Congress's intent in enacting the appropriations rider or on the interpretation of its statutory language." Maj. Op. 44. If § 254c-b(a)(1) sheds no light, HHS certainly didn't think so: it *relied* on the PHSA definition in formulating the Rule. *See* 84 Fed. Reg. at 7733 ("Congress has expressed its intent that . . . referrals be included as part of any nondirective counseling in Title X projects when it passed the . . . Public Health Service Act[.]"); 84 Fed. Reg. at 7745. As HHS apparently recognized, Congress's use of the term "nondirective

---

Rule's coercive requirements would force me to disrespect, contradict, and patronize my patient, and violate her trust[.]"  Kruse, Nat'l Family Planning & Reprod. Health Ass'n SER 262 (*Washington*).

counseling" should be read consistently between the PHSA and the nondirective appropriations rider to include providing referrals on an equal basis with all other options.  *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context."); *see also Dir., Office of Workers' Comp. Prog., Dep't of Labor v. Newport News Shipbldg. & Dry Dock Co.*, 514 U.S. 122, 130 (1995) (instructing that in interpreting an ambiguous statutory phrase, "[i]t is particularly illuminating to compare" two different statutes employing the "virtually identical" phrase).

Because the Gag Rule requires doctors to push patients toward one option over another, it violates Congress's mandate that patients receive counseling on their pregnancy options in a nondirective manner.

## II. The Rule Violates Section 1554 of the Affordable Care Act

In 2010, as part of the Affordable Care Act's ("ACA") sweeping reforms, Congress imposed limits on the scope of HHS's regulatory authority:

> Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—
>
> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;

(2) impedes timely access to health care services;

(3) interferes with communications regarding a full range of treatment options between the patient and the provider;

(4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;

(5) violates principles of informed consent and the ethical standards of health care professionals; or

(6) limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114 ("section 1554"). The three district courts separately determined that the Rule violates section 1554 of the ACA. *See Oregon*, 389 F. Supp. 3d at 914–15; *California*, 385 F. Supp. 3d at 992–1000; *Washington*, 376 F. Supp. 3d at 1130. I agree.

First, the Gag Rule—which restricts communications between health care providers and patients, 42 C.F.R. §§ 59.14(a)–(c)—will "obfuscate and obstruct patients from receiving information and treatment for their pressing medical needs." *California*, 385 F. Supp. 3d at 998; *see also Washington*, 376 F. Supp. 3d at 1130. In so doing, the Rule exceeds HHS's statutory authority: it "impedes timely access to health care services[,]" "interferes with communications

regarding a full range of treatment options[,]" "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions[,]" and "violates . . . the ethical standards of health care professionals[.]"  42 U.S.C. § 18114.

Second, the Separation Requirement—which requires Title X recipients to physically and financially separate abortion provision from all other medical services, through the use of separate entrances and exits as well as separate accounting, personnel, and medical records, 42 C.F.R. § 59.15—plainly will impinge on the ability of providers to offer care.  *See Oregon*, 389 F. Supp. 3d at 915; *Washington*, 376 F. Supp. 3d at 1130.  By its own terms, HHS's Separation Requirement creates unreasonable barriers to health care; it also frustrates "timely access" to care, contrary to Congress's plain directive that HHS may not do so.  42 U.S.C. § 18114.

Finally, the Rule's requirement that doctors encourage family participation in reproductive decisions will "force [doctors] to breach their ethical obligations" in certain circumstances.  *California*, 385 F. Supp. 3d at 1000; *see also Washington*, 376 F. Supp. 3d at 1130.  This requirement directly contravenes Congress's prohibition on promulgating regulations that "violate[] . . . the ethical standards of health care professionals[.]"  42 U.S.C. § 18114.

Tellingly, the majority does not even attempt to argue that the Rule complies with the ACA.  Instead, it characterizes the Rule as falling conveniently outside the scope of the limitations Congress imposed on HHS in the ACA.  It relies on the *Rust* and *McRae* line of cases for the proposition that, as a constitutional matter, Congress need not subsidize abortion.  It then asserts that the constitutional minima

identified in those cases "applies equally" to statutory claims. Maj. Op. 55–59. The majority offers no support for this bold proposition.

How could it? Congress may, and regularly does, enact statutory requirements and protections that exceed the constitutional floor. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986) ("The Due Process Clause demarks only the outer boundaries . . . . Congress and the states, of course, remain free to impose more rigorous standards[.]"); *Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2094 (2019) (Kavanaugh, J., concurring) ("The constitutional floor is sturdy and often high, but it is a floor."). That is exactly what Congress has done here.[7] That a congressional decision not to subsidize abortion does not burden the abortion right in the *constitutional* sense, *see e.g., McRae*, 448 U.S. at 316, has no

---

[7] The majority's assertion that the ACA does not impact Title X is contradicted by the terms of the ACA. Maj. Op. 59–60. Section 1554 governs "*any* regulation," 42 U.S.C. § 18114 (emphasis added). If Congress had meant to restrict its scope to the ACA, it would have said "any regulation *pursuant to this Act.*" *Cf. St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 550 (1978) (discussing the breadth of the word "any" and concluding that if Congress intends to limit the scope of statutory language, it will make that explicit). As Judge Chen reasoned, the clause "[n]otwithstanding any other provision of this Act" is most naturally read to mean that the Secretary "cannot engage in the type of rulemaking proscribed by [s]ection 1554 even if another provision . . . could be construed to permit it." *California*, 385 F. Supp. 3d at 995. In other words, "the directive of [s]ection 1554 is to be given primacy" over other parts of the ACA.

bearing whatsoever on whether an agency has overstepped its statutory authority. And, here, the agency has.[8]

## III.  The Rule Is Likely Arbitrary and Capricious

Finally, I turn to Plaintiffs' claim that the promulgation of the Rule was arbitrary and capricious under the Administrative Procedure Act ("APA"). As an initial matter, the majority contends that it is appropriate, on review of the district courts' preliminary injunctions, to adjudicate the merits of the arbitrary and capricious claim. Maj. Op. 35–39. It is not. Unlike our consideration of Plaintiffs' first two claims, which required us to address the underlying legal question to determine whether the district courts abused their discretion, review of the arbitrary and capricious claim requires examination of the administrative record. We do not have the complete administrative record before us, and neither did the district courts when they issued the preliminary injunctions. Deciding the merits of Plaintiffs' arbitrary and capricious claim is therefore premature. *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more *nor less* information than did the agency when it made its decision.") (emphasis added); *Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975) ("The Administrative Procedure Act and the cases require that the complete

---

[8] The majority makes much of the fact that the Rule is purportedly "less restrictive in at least one important respect" than the 1988 regulation upheld in *Rust*. Maj. Op. 16. That is immaterial. The *Rust* decision predated the passage of the nondirective mandate by half a decade and the ACA by two decades, so whether the Rule or its 1988 predecessor violated those laws was not and could not possibly have been before the Court.

administrative record be placed before a reviewing court.");
*see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395
(1981) ("[G]iven the haste that is often necessary . . . a
preliminary injunction is customarily granted on the basis of
procedures that are less formal and evidence that is less
complete than in a trial on the merits. A party thus is not
required to prove his case in full at a preliminary-injunction
hearing[.]").**9** Indeed, "[t]o review less than the full
administrative record might allow a party to withhold
evidence unfavorable to its case, and so the APA requires
review of 'the whole record.'" *Boswell Mem'l Hosp.*,
749 F.2d at 792. Accordingly, I address only Plaintiffs'
*likelihood* of success on the merits. The majority should have
done the same.**10**

---

**9** Indeed, while Defendants pursued their appeals of the preliminary
injunctions, briefing advanced to the merits in the Eastern District of
Washington. There, Defendants produced to Plaintiffs the full
administrative record (two months after the preliminary injunction issued),
*see* Case No. 1:19-cv-03040-SAB, Dkt. No. 88 (June 24, 2019) and, with
the benefit of the complete record, Plaintiffs further developed their
arbitrary and capricious claim. *See* Case No. 1:19-cv-03040-SAB, Dkt.
No. 121 (Nov. 20, 2019).

**10** The cases on which the majority relies to proceed to the merits are
inapt. First, unlike the cases the majority cites, Maj. Op. 35–39, we do not
have the full administrative record before us. *Cf. Beno v. Shalala*, 30 F.3d
1057, 1064 n.11 (9th Cir. 1994) (reaching the merits because "Plaintiffs'
. . . claim requires a review of the administrative record, which is
*complete*, and interpretation of relevant statutes; additional fact-finding is
not necessary to resolve this claim") (emphasis added); *Blockbuster
Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1297 (9th Cir. 1998) (same,
because "[t]he record . . . is fully developed"); *see also Fla. Power &
Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("The APA specifically
contemplates judicial review *on the basis of the agency record compiled
in the course of . . . [the] agency action*[.]") (emphasis added). Nor is this
a case that implicates sensitive foreign policy concerns. *Munaf v. Geren*,

Under the APA, a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

When an agency changes its policy, the agency must provide a "reasoned explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The new policy need not be better than the old one, but it must be permissible and based on "good reasons." *Id.* When the reasons the agency relies on for changing its position are "not new," the agency fails to provide a "reasoned explanation." *Org. Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 967 (9th Cir. 2015) (en banc). "In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal quotation marks omitted). Here, the Rule replaced the regulation adopted in 2000, not the 1988 regulation addressed in *Rust*; thus the 2000 Rule is the one to which we must look to assess

---

553 U.S. 674, 692 (2008) (reasoning that reaching the merits was "the wisest course" because the case "implicate[d] sensitive foreign policy issues in the context of ongoing military operations").

HHS's changed positions. *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41270 (Jul. 3, 2000). Plaintiffs are likely to prevail on their claim that the promulgation of the Rule was arbitrary and capricious for at least two reasons.[11]

### A. *HHS Failed to Provide a Reasoned Justification for Its Policy Change*

First, the Rule represents a dramatic shift in policy, yet HHS failed to provide the required "reasoned explanation for its action." *Fox Television*, 556 U.S. at 515. Take the Gag Rule and Separation Requirement, for example. In 2000, when it adopted regulations rescinding the 1988 version of the Gag Rule, HHS explicitly considered Congress's recently enacted nondirective mandate as well as comments emphasizing that "medical ethics and good medical care . . . requir[e] that patients receive full and complete information

---

[11] None of the district courts needed to address Plaintiffs' arbitrary and capricious arguments because they had independently found Plaintiffs were likely to succeed on their other merits arguments. Nevertheless, each district court recognized the strength of Plaintiffs' APA challenge. *California*, 385 F. Supp. 3d at 1000–19 (addressing—with painstakingly detailed analysis—the shortcomings of HHS's justifications for the physical separation requirement, the counseling and referral restrictions, the "physicians or advanced practice providers" requirement, and the removal of the "medically approved" requirement, as well as HHS's inadequate cost-benefit analysis); *Oregon*, 389 F. Supp. 3d at 917–18 (noting that HHS "nowhere squares" particular medical ethics requirements with the requirements of the Rule and that HHS "appears to have failed to seriously consider persuasive evidence"); *Washington*, 376 F. Supp. 3d at 1131 (recognizing that Plaintiffs and amici had "presented facts and argument that the . . . Rule is arbitrary and capricious because it reverses long-standing positions of [HHS]" without considering relevant medical opinions and likely consequences).

to enable them to make informed decisions"; "[c]onsequently," the agency "decided to reflect [the nondirective requirement] . . . in the regulatory text." 65 Fed. Reg. at 41273. By contrast, here HHS has changed its position on what medical ethics demand without providing a reasoned explanation for or acknowledgment of the change, as is required by the APA.[12] *See Org. Vill. of Kake*, 795 F.3d at 966 ("Unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary and capricious change.") (internal quotation marks and citation omitted).[13]

---

[12] That abortion remains controversial, as the majority contends, Maj. Op. 75 n.34, does not explain why HHS may shift its understanding of medical ethics from 2000 without a reasoned explanation.

[13] I also agree with Judge McShane of the District of Oregon that HHS's "failure to respond meaningfully to the evidence" that the Gag Rule contradicts medical ethics "renders its decision[] arbitrary and capricious." *Oregon*, 389 F. Supp. 3d at 918 (quoting *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000)). A doctor and leader of the American Medical Association—the organization that "literally wrote the book on medical ethics"—stated that the American Medical Association's *Code of Medical Ethics* prohibits withholding information from a patient, except in emergency situations, and requires decisions or recommendations to be based on the patient's medical needs. *Id.* at 916. He concluded that the Gag Rule "is an instruction to physicians to intentionally mislead patients, which, if followed, is an instruction for physicians to directly violate the *Code of Medical Ethics*[.]" *Id.* at 917.

In its cursory response, HHS merely announced that it "believes" the Rule presents no ethical problems because patients are permitted to ask questions "and to have those questions answered by a medical professional." 84 Fed. Reg. at 7724. That assertion is contradicted by the plain text of the Rule, which specifically prohibits medical professionals from answering certain questions, such as, "who on this list is an abortion provider?" 42 C.F.R. § 59.14(c)(2). HHS's insistence that the Gag Rule is "nondirective" does not salvage the Rule either, as it is both conclusory

Similarly, in 2000, HHS recognized that "Title X grantees are subject to rigorous financial audits" and ultimately concluded that a physical separation requirement "is *not* likely ever to result in an enforceable compliance policy that is consistent with the efficient and cost-effective delivery of family planning services." 65 Fed. Reg. at 41275–76 (2000) (emphasis added). As justification for its about-face in the new Rule, HHS speculated about a "risk" of Title X funds being used for impermissible purposes.[14]   84 Fed. Reg. at 7765 (discussing the risk of "potential co-mingling" without citing *any* evidence of co-mingled funds). A speculative risk is not a reasoned explanation. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1244 (9th Cir. 2001); *see also Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006).

### B.   *HHS's Cost-Benefit Analysis Is Contrary to the Evidence*

Second, the Rule is likely arbitrary and capricious because HHS offered an explanation for its cost-benefit

---

and, for the reasons explained in Section I, *supra*, false. Because the Gag Rule "contradicts . . . persuasive evidence from the leading expert on medical ethics," and HHS has failed to present even a "plausible explanation outlining its rationale for rejecting the evidence and reaching a different conclusion," *Oregon*, 389 F. Supp. 3d at 917 (citing *State Farm Mut.*, 463 U.S. at 43), it is arbitrary and capricious. The majority is wrong to conclude otherwise.

[14] To be clear: the "recent studies" that the majority notes HHS relied on do not demonstrate any actual misuse of Title X funds. Maj. Op. 66. Rather, they reflect facilities that comply with Title X but likely will be forced out of the program by the Separation Requirement. 84 Fed. Reg. at 7765.

analysis that runs contrary to the evidence before the agency. *See State Farm Mut.*, 463 U.S. at 43. As the district courts explained, there are at least three provisions of the Rule that will cause providers to leave the Title X program, leading to decreased access to Title X-funded care, which will in turn create costs that HHS did not account for.

First, the Gag Rule. Because it "require[s] doctors to violate . . . fundamental ethical and professional norms[,]" *Oregon*, 389 F. Supp. 3d at 916, the Gag Rule will trigger providers to leave the Title X program, "drastically reduc[ing] access to Title X services, and lead[ing] to serious disruptions in care for Title X patients." *California*, 385 F. Supp. 3d at 1008. For example, the provider serving approximately 40% of all Title X patients—1.6 million people—which is also the only family planning provider in ten percent of rural counties, declared that if the Gag Rule is implemented, it will leave the Title X program in order to maintain its ethical obligations to patients.[15] *Oregon*, 389 F. Supp. 3d at 918; *California*, 385 F. Supp. 3d at 979.

---

[15] Indeed, this exodus has come to pass. Plaintiffs informed us that all Planned Parenthood Title X direct grantees would withdraw from Title X beginning August 19, 2019, as a result of enforcement actions by HHS, and they have done so. *See* Sarah McCammon, *Planned Parenthood Withdraws From Title X Program Over Trump Abortion Rule*, Nat'l Pub. Radio (Aug. 19, 2019), https://www.npr.org/2019/08/19/752438119/pla nned-parenthood-out-of-title-x-over-trump-rule. Planned Parenthood is not alone. *See* Nicole Acevedo, *Nearly 900 Women's Health Clinics Have Lost Federal Funding Over Gag Rule*, NBC News (Oct. 22, 2019) https://www.nbcnews.com/news/latino/nearly-900-women-s-health-clinics-have-lost-federal-funding-n1069591; Anna North, *How A Beloved Clinic for Low-Income Women Is Fighting to Stay Alive in the Trump Era*, Vox (Nov. 22, 2019), https://www.vox.com/identities/2019/11/22/2095 2297/title-x-funding-abortion-birth-control-trump.

Second, the Separation Requirement. Compliance with the Separation Requirement will be so cost-prohibitive for many providers that they will have to leave the Title X program.[16] *California*, 385 F. Supp. 3d at 1008–11.

Third, the requirement that only "physicians or advanced practice providers" may provide counseling. *See* 84 Fed. Reg. at 7727–28 (defining "advanced practice providers"). This limitation will significantly reduce the number of people who can provide pregnancy counseling and will require significant changes in Title X providers' staffing, or else devastate their capacity to serve patients. *Id*. at 7778 (noting that for "1.7 million Title X family planning encounters in 2016," services were delivered by providers who are not "physicians or advanced practice providers"); *California*, 385 F. Supp. 3d at 1013 (recognizing that "65% of Title X sites rel[ied] on trained health educators, registered nurses, and other qualified providers (excluding physicians and advanced practice clinicians) to counsel patients in selecting contraceptive methods") (internal quotation marks and citation omitted).

---

[16] HHS also calculated costs of compliance with the physical separation requirement in a "mystifying" way. *California*, 385 F. Supp. 3d at 1008. HHS's internal guidelines—and common sense—suggest that compliance costs for making physically separate facilities would include expenses related to equipment, leasing space, utilities, and personnel. Yet, HHS estimated that an average of only $30,000 per affected Title X site would be incurred to comply with the physical separation requirement. 84 Fed. Reg. at 7782. As Plaintiffs' counsel indicated at oral argument, even just hiring a *single* front desk staff member to staff a new entrance to a facility would exceed that estimate, not to mention all the other costs that would accompanying creating and maintaining such a facility. *See, e.g.,* Washington SER 355–56 (*Washington*); California SER 396–97 (*California*).

HHS dismissed the loss of access by speculating that there would not "be a decrease in the overall number of facilities offering [Title X] services, since [HHS] anticipates other, new entities will apply for funds, or seek to participate as subrecipients, as a result of the final rule." 84 Fed. Reg. at 7782. HHS simultaneously contradicted that very prediction, by stating, "[HHS] *cannot* calculate or anticipate future turnover in grantees." *Id*. (emphasis added). Nonetheless, HHS stated, "[b]ased on [HHS's] best estimates, it anticipates that the net impact on those seeking services from current grantees will be zero[.]" *Id*. HHS provided *no explanation* of how it arrived at its "best estimates." *See also California*, 385 F. Supp. 3d at 983 ("[A]t oral argument [before the district court], when pressed for any record evidence substantiating this (highly consequential) assertion, Defendants' counsel could offer none."). Nor did HHS provide any specifics about its estimates, such as the locations or geographic distribution of any "new" clinics, their number or size, or how long it would take them to become operational grantees. Thus, HHS failed to offer "an explanation for its decision that runs counter to the evidence before" it. *State Farm Mut.*, 463 U.S. at 43. Proceeding in this manner is the hallmark of arbitrary and capricious administrative action.

The majority disagrees, citing readily distinguishable case law and a poll that did not conclude what the majority purports it does.[17] Maj. Op. 68–69. The "poll" that HHS

---

[17] The majority relies extensively on the Supreme Court's recent opinion, *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019). Maj. Op. 62, 63–64, 70–77. That case raised the issue of whether the Secretary of Commerce was required to accept the Census Bureau's predictions about accurate gathering of citizenship data. *Dep't of Commerce*, 139 S.

cited is a summary showing both that a majority of "faith-based healthcare professionals" would prefer not to violate their conscience *and* that a *majority* of them *never* experienced pressure to refer a patient for a procedure to which the professional had moral, ethical, or religious objections. 84 Fed. Reg. at 7780 n.138; Freedom2Care & The Christian Med. Ass'n, *National Poll Shows Majority Support Healthcare Conscience Rights, Conscience Law* (May 3, 2011), https://perma.cc/3AU4-ACGA. Nothing suggests that the poll asked medical professionals about expanding into Title X. It is baffling how HHS made the leap from the poll data—the quality and veracity of which is unclear from the summary the agency cited—to its conclusion that there would be no decrease in facilities. *Id*. And a predicate to giving deference to an agency is that the agency's inferences must not *contradict* the findings of the study. *State Farm Mut.*, 463 U.S. at 43. That is by no means *de novo* review, contrary to the majority's contention. Maj. Op. 69 n.29.

---

Ct. at 2569. The Court held that the Secretary was not beholden to the Bureau's analysis because "the Census Act authorizes the Secretary, *not the Bureau*, to make policy choices within the range of reasonable options[,]" *id*. at 2571 (emphasis added), *and* there was support for the Secretary's decision, *id*. at 2569. Conversely, here, we are reviewing HHS's own administrative decisions in the face of contravening evidence, and there is no support for HHS's decisions.

Moreover, the Court *struck down* the Secretary of Commerce's attempt to reinstate the citizenship question on the census. *See* 139 S. Ct. at 2575–76 ("Our review is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are free.'"). Similarly, here, deference to HHS does not mean turning a blind eye to the agency's actions, as the majority does.

Moreover, the cases on which the majority relies to endorse HHS's guesswork arose in different circumstances. Maj. Op. 68–71. When the Supreme Court in *FCC v. National Citizens Committee for Broadcasting* condoned an agency's "forecast" for future behaviors without "complete factual support," the underlying agency decision was "to 'grandfather'" existing policies into a new rule. 436 U.S. 775, 813–14 (1978). There, the agency's predictions concerned maintenance of the status quo, rather than the change in policy HHS made here. And in other cases cited by the majority, the regulations at issue "reflect[ed] reasoned predictions about technical issues." *BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008) (citation omitted); *see also Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009) (noting that the record showed that the agency relied on "scientific data, and not on mere speculation"). HHS's prediction here is not reasoned or based on any data or studies, and should not be afforded deference. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) ("[T]he wisdom of agency action is rarely so self-evident that no other explanation is required."); *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) ("[W]e do not defer to the agency's conclusory or unsupported suppositions.").

Further, because of HHS's sunny, and baseless, prediction that new clinics will appear to provide services to at least 40% of the patient population served by Title X, HHS did not address the potential health consequences of decreased services and their corresponding costs in its cost-benefit analysis. As the Northern District of California recognized, the decreased services could cause a 31% increase in the nation's unintended pregnancy rate, which would lead to "[b]illions of dollars in public costs[.]" *California*, 385 F.

Supp. 3d at 1016. Even if the number of clinics were to remain the same, a changed geographic reach would have devastating consequences. *See* 84 Fed. Reg. at 7782 (recognizing that patients will have to travel further to obtain health care); *California*, 385 F. Supp. 3d at 1017–18 (noting that when a rural Indiana county lost a Planned Parenthood clinic, "the county lost free HIV testing services and almost immediately experienced one of the largest and most rapid HIV outbreaks the country has ever seen") (internal quotation marks omitted). An agency governed by the APA must grapple with potential costs, and HHS—an agency with power over public health, no less—failed to do so here. *See State Farm Mut.*, 463 U.S. at 43; *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012).

The majority is correct that we give agencies deference—but only insofar as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm Mut.*, 463 U.S. at 43 (internal quotation marks omitted). The majority fails to hold HHS to that basic standard here.

\*\*\*

In vacating the preliminary injunctions, the majority blesses an executive agency's disregard of the clear limits placed on it by Congress. The consequences will be borne by the millions of women who turn to Title X-funded clinics for lifesaving care and the very contraceptive services that have caused rates of unintended pregnancy—and abortion—to plummet.

I strongly dissent.